302 Ga. 474
FINAL COPY

S17A1216.  WILLIAMS v. THE STATE.

GRANT, Justice.

Appellant Temon Jarmell Williams was convicted of malice murder and other crimes in connection with the October 2012 stabbing death of Shawn Doughty.  Williams now appeals, asserting insufficiency of the evidence, erroneous admission of expert testimony, erroneous admission of evidence seized during a search of his residence, and ineffectiveness of his trial counsel for various reasons.  Although we find no error regarding Williams's contentions, we affirm in part and vacate in part due to a sentencing error.[1]

---

[1] The murder was committed on October 22, 2012.  Williams was indicted by a Clarke County grand jury.  At the conclusion of a trial held June 3-7, 2013, a jury found Williams guilty of malice murder (Count 1), felony murder (Count 2), two counts of aggravated assault (Counts 3 and 4), criminal attempt to commit the murder of Shawn's sister (Count 5), aggravated assault (family violence) (Count 7), and six counts of possession of a knife during the commission of a crime (Counts 9, 10, 11, 12, 13, and 15).  The trial court sentenced Williams to life imprisonment without parole for malice murder, twenty years to serve for the aggravated assault conviction on Count 4, thirty years to serve for criminal attempt to commit murder, and five years to serve for three of the convictions for possession of a knife during the commission of a crime (Counts 9, 12, and 13), all running consecutively; the trial court merged the remaining convictions for sentencing.  The aggravated assault count for which

I.

Viewed in the light most favorable to the jury's verdict, the evidence at trial showed as follows. On the evening of October 22, 2012, Clarke County police responded to a call of two males fighting in a neighborhood street and a possible stabbing. Upon arrival, the responding officer found Shawn Doughty lying in the street, bleeding heavily. Shawn's twin sister and another witness, a male neighbor, were watching over Shawn when the responding officer arrived. When the officer asked the sister who stabbed Shawn, she replied that her ex-boyfriend Temon Williams had done so. The sister and the neighbor pointed toward 227 Woody Lane, indicating that

Williams was sentenced to twenty years to serve, however, was predicated on the same attack for which he was convicted of malice murder, and although that attack involved two separate stabbings, "there was no evidence that the [stabbings] occurred in a manner other than in a single transaction, with no 'deliberate interval' separating . . . the [stabs]." *Jeffrey v. State*, 296 Ga. 713, 718 (3) (770 SE2d 585) (2015) (quoting *Ortiz v. State*, 291 Ga. 3, 6 (3) (727 SE2d 103) (2012)). Therefore, the trial court should have merged Count 4's aggravated assault conviction with Count 1's malice murder conviction for sentencing purposes. Consequently, Count 13's conviction for possession of a knife during the commission of a crime, which was predicated on Count 4, also should have merged. Accordingly, we vacate that portion of the trial court's sentencing order in which it purported to impose sentences of twenty years and five years to serve on Counts 4 and 13, respectively. Williams filed a timely motion for new trial on June 17, 2013, which was subsequently amended. A hearing was held on the motion on June 1, 2016, and the motion was denied on October 26, 2016. Williams filed his notice of appeal on November 16, 2016. The appeal was docketed to the April 2017 term of this Court and thereafter was submitted for a decision on the briefs.

Williams was inside. Shawn was unable to make any statements. Officers attempted to aid Shawn until EMTs arrived and transported him to the hospital where he was pronounced dead. Shawn was stabbed once through the heart and once in the back; both wounds were sharp force injuries.

At the scene, police saw that the sister was also bleeding, and she told them that Williams had stabbed her as well. She had been stabbed in the back and had a cut on the left side of her face. Officers knocked on Williams's door and loudly announced their presence, but there was no response. Additional officers arrived, including SWAT members, and after a standoff, which included telephone conversations between Williams and his cousin in which Williams claimed he was dying, Williams exited the duplex and was handcuffed. Williams had cut wounds to his wrist and upper chest. While arresting Williams, officers found a handwritten note in his possession, which prompted Williams to say, "That's what's wrong with me right there, that letter right there. Keep that for evidence."[2]

Upon his arrest, Williams was transported to the hospital where his injuries were treated; they did not require sutures. Williams told medical

---

[2] The letter was written by the sister in 2009 after an argument in which Williams had accused her of cheating on him, but it was never delivered to Williams. Apparently, Williams found it among her personal items and he also wrote on it the name and number of a person he accused her of having a romantic relationship with.

staff that after he had read the letter, his girlfriend got mad and stabbed him with a kitchen knife. In response to a nurse's question of whether anyone was hurting or threatening him, Williams replied no. The emergency room physician who examined Williams's wounds, Dr. Lewis Earnest, believed the wounds were self-inflicted based on his observations, discussed more fully below.

When police arrested Williams, they immediately conducted a "protective sweep" of his residence and saw a bloody T-shirt in the living room and a knife in the bedroom, both in plain sight. After exiting the residence, officers obtained a search warrant for the residence (the supporting affidavit referenced the protective sweep and observation of the bloody shirt and knife). These items were then seized when the search warrant was executed. The knife found in the bedroom had blood on it, which matched Williams's DNA. A bent knife was also found outside the residence with blood on it that matched Shawn and his sister's DNA.

Six days prior to Shawn's murder, on October 16, Williams was released from prison. Shawn's sister had previously been in a relationship with Williams, and maintained that relationship for some time during his incarceration. But she eventually decided to end their relationship, and she

informed him of her decision. She agreed to help him as a friend, however, and shortly before his release, secured a residence for him to live in. Around that time, Williams's parole officer contacted Shawn's sister to verify Williams's new address and to advise her of various things concerning his release, including the fact that Williams was HIV positive. The sister confronted Williams about this revelation on the phone, and he assured her that he was going to tell her, and also that if she would just help him out as a friend, then they could go their separate ways. She reluctantly agreed, and had personal items of hers that were in storage moved into the residence to furnish it for Williams (presumably, the 2009 letter was among the items in storage that were moved into Williams's residence). In the days following Williams's release, the sister helped him run several errands, such as visiting his parole officer and being fitted with his ankle monitor. Williams repeatedly asked the sister if she was dating anyone and if she would get back together with him, but she continuously rebuffed him, which made him noticeably upset and angry. On Friday, October 19, after she again refused Williams's advances, he threatened her with a butter knife and forced her to have sex with him. She played along long enough to flee when she had the opportunity the next morning, leaving behind her purse and other personal

items.  That day, she told him on the phone that "it was over" and she would never be alone with him again.

She did not disclose these facts to her brother Shawn, who was Williams's good friend.  Shawn and Williams "hung out" as friends over the weekend, and on Monday, October 22 (the day of the murder), they arrived at the home of Shawn and his sister's grandmother to retrieve a grill their grandmother was giving Williams.  Williams then told them that he lost his ride home and needed a ride back home before his curfew.  The sister agreed to take Williams home, but only if Shawn would accompany them; which he agreed to do.  On the ride home, Williams sat in the front seat, telling the sister that he loved her and trying to hold her hand, but she told him to stop.  When they arrived at Williams's residence, and after Shawn and Williams took the grill into the residence and returned, Williams told the sister that she could go retrieve the items she had left at his residence and that no one would bother her.  She went into the residence, but her items had been moved, and, sensing something was wrong, she quickly left.  As she walked back outside, she heard Shawn screaming her name from the street, and then saw Williams advancing toward her.  She ran, but Williams caught her, stabbing her in the back and then beating and strangling her.  Two neighbors heard the

6

commotion. A female neighbor heard the sister screaming. That neighbor then saw the sister running from Williams; Williams caught her and began punching and hitting her. He then pulled something from his pocket, stood behind her, and stabbed her. The other neighbor, the male whom officers encountered when arriving at the scene, heard the sister screaming and saw Williams manhandling her and lifting her off the ground. That neighbor yelled for Williams to stop and told him the police were coming, at which point Williams ran into his residence.

At trial, Dr. Earnest testified that based on Williams's behavior and the pattern of his wounds — the wrist wounds were of similar depth; the cut to the left wrist was common for a right-handed person cutting himself; the cuts to the wrist were running toward the body, also common for people cutting themselves; the chest wounds' location on the left side of the chest were consistent with a right-handed person stabbing himself; the chest wounds were in two orientations of vertical and horizontal, indicating wrist movement but not defensive wounds; and all the wounds were shallow — it was Dr. Earnest's opinion that Williams's injuries were self-inflicted. He testified that he had only seen wrist injuries like Williams's from self-inflicted injuries.

Williams also testified in his own defense as follows. While he was down on his knees inside the car looking for a key, Shawn attacked him from behind. Shawn was holding two knives, and Williams snatched one of the knives from Shawn and hit him in the front and then in the back as Shawn came at him. Williams then noticed the other knife was "in me." Shawn ran away. The sister then came out of the residence, saw Williams, and "took off hollering like she fixin' to go tell a lie," so he chased her, and accidentally cut her with the knife he was holding while he was trying to help her up after she fell. Williams then went into his residence because the male neighbor arrived and told Williams to stop hitting the sister, even though he was not. The trial court charged the jury on self-defense.

As we have explained, "[i]t was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence." *Vega v. State*, 285 Ga. 32, 33 (1) (673 SE2d 223) (2009) (citation and punctuation omitted). Contrary to Williams's contention, the evidence described above was sufficient to enable a rational jury to conclude beyond a reasonable doubt that Williams was guilty of the crimes of which he was convicted. *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

## II.

Williams asserts that the trial court erred in overruling his objection to emergency room doctor Lewis Earnest's opinion testimony because the State failed to satisfy the conditions of OCGA § 17-16-4 (a) (4). "We review a trial court's evidentiary rulings under an abuse of discretion standard of review." *Smith v. State*, 284 Ga. 304, 306 (3) (667 SE2d 65) (2008) (footnote omitted).

Georgia law requires the prosecution to reduce any relevant oral portions of physical examination reports to writing, and to timely serve the reports on opposing counsel. See OCGA § 17-16-4 (a) (4). Williams contends that the State failed to comply with this rule, and that if the State had complied, then Williams could have retained his own expert to review a written report of Dr. Earnest's opinion and possibly rebut his testimony. He further argues that the trial court's admission of Dr. Earnest's opinion testimony was harmful because Dr. Earnest's opinion that Williams's wounds appeared self-inflicted undercut Williams's assertion of self-defense.

OCGA § 17-16-4 (a) (4) requires timely disclosure of

report[s] of any physical or mental examinations and of scientific tests or experiments, including a summary of the basis for the expert opinion rendered in the report, or copies thereof, if the

9

state intends to introduce in evidence in its case-in-chief or in rebuttal the results of the physical or mental examination or scientific test or experiment.

The statute further provides that "[i]f the report is oral or partially oral, the prosecuting attorney shall reduce all relevant and material oral portions of such report to writing and shall [timely] serve opposing counsel with such portions." Williams claims error under these provisions, but the evidence shows that the State provided Williams's trial counsel with all of his medical records arising out of the incident, including Dr. Earnest's written medical reports and records. There is no evidence that Dr. Earnest made a "report [that] is oral or partially oral." The State was under no duty to reduce to writing a non-existent oral report. *Heywood v. State*, 292 Ga. 771, 777 (4) (b) (743 SE2d 12) (2013) ("Appellant has pointed to nothing in the record to prove that [the expert] ever made such an oral report before he testified. In the absence of such a showing, Appellant cannot establish a violation . . . of . . . OCGA § 17-16-4 (a) (4)."). There was no violation of OCGA § 17-16-4 (a) (4), and Williams's argument to the contrary fails.

### III.

Williams next contends that the trial court erred in denying his motion to suppress evidence, including a bloody shirt and knife, seized during the

10

execution of the search warrant on his residence because the police first unlawfully searched the residence under the pretense of a "protective sweep" and used observations from that sweep to obtain the search warrant. This argument also fails.

"On appellate review of a ruling on a motion to suppress, the trial court's findings on disputed facts will be upheld unless clearly erroneous, and its application of the law to undisputed facts is subject to de novo review." *Brown v. State*, 295 Ga. 695, 697 (763 SE2d 710) (2014) (citation and punctuation omitted).

The Fourth Amendment of the Constitution of the United States and Article I of the Constitution of the State of Georgia prohibit unreasonable searches and seizures. See U. S. Const. Amend. IV; Ga. Const. of 1983, Art. I, Sec. I, Par. XIII. A cursory warrantless search limited to spaces where a person may be found, known as a "protective sweep," is permissible when officers reasonably believe, based on articulable facts known to them at the time together with rational inferences drawn from those facts, that the sweep is necessary to protect or preserve life or to avoid serious injury to officers or others because of the potential presence of other dangerous persons or of additional victims. See *Maryland v. Buie*, 494 U. S. 325 (110 SCt 1093, 108

LE2d 276) (1990); *Lawler v. State*, 276 Ga. 229, 233 (576 SE2d 841) (2003) (protective sweep of murder suspect's home after stand-off with police and arrest to look for other possible suspects or victims was reasonable). Evidence observed in plain view during a lawful protective sweep may be seized or used to support the swearing out of a search warrant. *Lawler*, 276 Ga. at 233; *Harris v. State*, 298 Ga. 588, 590-591 (783 SE2d 632) (2016).

The evidence here supports the trial court's finding that the officers' sweep of Williams's home immediately after he was taken into custody was lawful. Williams's arrest was part of a rapidly unfolding situation in which officers responded to a 911 call regarding people fighting in the street and a possible stabbing. They found a dying victim in the street upon arrival at the scene with another victim in hysterics. Williams had locked himself inside his residence causing a brief standoff with law enforcement, and when Williams exited the residence, he too had cuts to his body. Officers on the scene testified that they did not know whether other assailants or victims remained inside the residence, and they swept the residence to make sure no one else was inside. Under these circumstances, the officers acted reasonably in conducting a protective sweep, and their sweep was no more extensive than necessary to detect immediate danger. No illegal search occurred, the

items officers observed in plain view were permissibly used in obtaining a search warrant, and the trial court properly admitted the subject evidence.

## IV.

Williams contends that his trial counsel was ineffective for failing to: (1) impeach the male neighbor witness with his 1990 murder conviction; (2) request a continuance upon learning of Dr. Earnest's opinion testimony or interview Dr. Earnest before trial; (3) fully cross-examine the emergency room nurse who treated Williams; and (4) object to certain statements made by the State during opening statements that Williams had allegedly raped the victim's sister and was HIV positive, as well as trial testimony from State witnesses regarding the alleged rape, Williams's HIV status, and Williams's "belligerent" and "hostile" behavior while receiving medical treatment at the hospital.

To prevail on an ineffective assistance of counsel claim, the defendant must satisfy the familiar standard set out in *Strickland v. Washington*, 466 U. S. 668 (104 SCt 2052, 80 LE2d 674) (1984). Under the *Strickland* standard, a defendant must prove both that the performance of his lawyer was deficient and that he was prejudiced by the deficient performance. *Mims v. State*, 299

Ga. 578, 579-580 (1) (787 SE2d 237) (2016).  We review each of Williams's claims of ineffectiveness below.

(a)    Williams first contends his trial counsel was ineffective for failing to impeach the male neighbor with a 1990 murder conviction.  OCGA 24-6-609 (a) provides:

> For the purpose of attacking the character for truthfulness of a witness:
>
>> (1) Evidence that a witness other than an accused has been convicted of a crime shall be admitted subject to the provisions of Code Section 24-4-403 if the crime was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted . . . .

Subsection (b) further provides:

> Evidence of a conviction under this Code section shall not be admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for such conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect. However, evidence of a conviction more than ten years old, as calculated in this subsection, shall not be admissible unless the proponent gives to the adverse party sufficient advance written notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence.

During trial, Williams's counsel did seek to impeach the neighbor with his 1990 murder conviction. The State moved in limine to prevent the use of the conviction for impeachment purposes because it was beyond the ten-year time limit set forth in OCGA § 24-6-609 (b) (Rule 609). The neighbor testified that he was released from confinement in 1995 or 1996. Williams's counsel did not challenge the neighbor's statement regarding his release date. The trial court ruled that the conviction was inadmissible because it was beyond the statutory ten-year limit, and also noted that Williams's counsel had not given the requisite notice to the State as required for attempts to admit convictions older than ten years.

On appeal, Williams argues that the 1990 murder conviction was admissible for impeachment purposes because the neighbor's Georgia Crime Information Center criminal history indicates the neighbor was arrested in 2008 for a parole violation, and that the arrest was a "confinement" within ten years of his 2013 trial testimony. Williams cites a Fourth Circuit case and a Ninth Circuit case in support of his argument that a parole revocation arrest constitutes a "confinement" imposed for the original conviction and should be used as the date for time computation pursuant to Rule 609. See

*United States v. Gray*, 852 F2d 136 (4th Cir. 1988); *United States v. McClintock*, 748 F2d 1278 (9th Cir. 1984).  Georgia's Rule 609 and the Federal Rule on which it was modeled are both silent on the issue of whether confinement pursuant to a parole revocation is confinement imposed for the original conviction within the meaning of the rule.  Addressing that issue in the context of a probation violation, *McClintock* made the "narrow holding" that "confinement imposed for *substantive* probation violations *that implicate the original . . . activity* is 'confinement' for the original offense within the meaning of 609(b)."  748 F2d at 1289 (emphasis supplied).  *Gray*, likewise, involved "prior criminal activity followed by subsequent criminal activity."  852 F2d at 139 (punctuation omitted).  It does not appear that this Court, the Eleventh Circuit, or the United States Supreme Court have addressed the question, and trial counsel's performance cannot be deemed deficient for not raising an unsettled question of law.

We also need not decide the question today because Williams fails to provide sufficient evidence of the neighbor's confinement within ten years of the 2013 trial.  Williams provides nothing more than a printout of the neighbor's criminal history, which merely indicates that he was arrested on September 3, 2008 for a parole violation.  It provides no disposition or

16

outcome. Williams presents no other documentation from either the court that would have handled any revocation or the Department of Corrections showing what, if anything, happened regarding any parole violation. Nor did Williams call the neighbor as a witness at the motion for new trial hearing to inquire into the facts surrounding any violation. In short, Williams provides no evidence at all establishing that the neighbor's parole was ever revoked, much less that the neighbor was actually confined pursuant to any revocation. We cannot assume, based on nothing more than an indication on the neighbor's criminal history that he was arrested for a parole violation, that his parole was actually revoked and additional confinement imposed. See *Morrissey v. Brewer*, 408 U. S. 471, 488-489 (III) (b) (92 SCt 2593, 33 LE2d 484) (1972) (due process required to revoke parole). Accordingly, Williams has not presented evidence that would even arguably bring his confinement within Rule 609 (b)'s ten-year period. Therefore, Williams has not shown that trial counsel's performance was deficient in this respect. Relatedly, even if the neighbor's murder conviction had been admitted for impeachment purposes and the jury completely disregarded his testimony as a result — which seems highly unlikely — the verdict still has "'overwhelming record support'" and there is no "reasonable probability that the outcome of the trial

would have been different." *Daughtry v. State*, 296 Ga. 849, 862 (2) (k) (770 SE2d 862) (2015) (quoting *Strickland*, 466 U. S. at 696).

(b) Second, Williams contends his trial counsel was ineffective for failing to request a continuance upon learning of Dr. Earnest's opinion testimony or to interview Dr. Earnest before trial. Williams argues that if his trial counsel would have done either, then he could have sought out and retained his own expert to review and potentially rebut Dr. Earnest's conclusions.

To this day, however, Williams has presented no evidence that any expert would contradict Dr. Earnest's conclusions. Because Williams "did not make any proffer whatever to show that the testimony of such witness[ ] would have been relevant and favorable, and, thus, would have resulted in a different verdict," he cannot establish prejudice. *Wells v. State*, 281 Ga. 253, 255 (2) (a) (637 SE2d 8) (2006) (rejecting ineffective assistance claim based on failure to request continuance to locate potential exculpatory evidence); see also *Harvey v. State*, 284 Ga. 8, 11 (4) (c) (660 SE2d 528) (2008) (rejecting ineffective assistance claim based on failure to interview witness where defendant failed to show what a more thorough investigation would

18

have uncovered). His ineffective assistance of counsel claim, therefore, fails in this regard as well.

(c) Third, Williams contends that his trial counsel was ineffective in failing to fully cross-examine the emergency room nurse who treated Williams while he was in police custody at the hospital. Although Williams couches this contention as an ineffective assistance claim, the thrust of his argument is that because he was in custody and law enforcement personnel were present at the time the nurse spoke to him, and because the medical records note that Williams did not want to speak with medical staff without a lawyer, it was a violation of his *Miranda* rights to admit statements he made to the medical staff. His apparent contention is that had trial counsel cross-examined the nurse regarding the medical record notations that Williams did not want to speak with medical staff without a lawyer, then the *Miranda* violation would have become apparent and the trial court would have granted trial counsel's objection to these statements. We disagree.

First, cross-examinations are quintessential trial strategy and will rarely constitute ineffective assistance. *Butler v. State*, 273 Ga. 380, 385 (10) (541 SE2d 653) (2001) ("[A] matter such as the cross-examination of a witness is most often grounded in matters of trial tactics and strategy."). And

19

Williams's trial counsel did object to the admission of statements Williams made to the nurse, arguing that those statements were inadmissible because Williams was in custody at the time; the trial court correctly overruled the objection.

*Miranda* does not govern questioning by private citizens who are not acting at the behest of law enforcement. *Mitchell v. State*, 282 Ga. 416, 421 (6) (f) (651 SE2d 49) (2007); see also *Cook v. State*, 270 Ga. 820, 826 (514 SE2d 657) (1999) (holding that "[t]he coercion proscribed by *Miranda* must be caused by the police," and collecting "[n]umerous cases hold[ing] that *Miranda* is not implicated when a suspect in custody is questioned or encouraged to confess by [private actors]"). Williams's statements made to the emergency room nurse were admissible because they "were not made in response to interrogation by police but instead were answers he provided to the nurse treating him at the hospital after" the incident. *Mitchell*, 282 Ga. at 421 (6) (f). The evidence shows that the nurse spoke with Williams for the sole purpose of providing medical assistance and treatment, simply asking questions from a checklist according to protocol without conversing with police beforehand; she was not a police actor conducting a custodial

interrogation. Williams's trial counsel was not deficient and caused no prejudice in this respect.

(d) Finally, Williams contends that his trial counsel was ineffective when he failed to object under OCGA § 24-4-404 (b) (Rule 404 (b)) to statements made by the State during its opening that Williams was HIV positive and that he forced the victim's sister to have sex with him, as well as trial testimony from State witnesses regarding the alleged sexual assault, Williams's HIV status, and Williams's "belligerent" and "hostile" behavior while receiving medical treatment at the hospital. Williams argues that trial counsel should have objected to these statements and testimony because they were inadmissible under Rule 404 (b). In the alternative, Williams argues that if these statements and testimony were intrinsic to the crimes charged, as the trial court held in its order denying Williams's motion for new trial, they were still inadmissible under Rule 403 because their probative value was substantially outweighed by the danger of unfair prejudice. He asserts that because trial counsel failed to object, the trial court did not conduct the requisite hearing and balancing analysis before admitting the evidence.

Williams's contentions are incorrect. The limitations and prohibition on "other acts" evidence set out in OCGA § 24-4-404 (b)[3] do not apply to "intrinsic evidence." See *United States v. Edouard*, 485 F3d 1324, 1344 (11th Cir. 2007); *Brewner v. State*, 302 Ga. 6 (804 SE2d 94) (2017). This Court and the Eleventh Circuit have both set out factors defining this type of evidence: Evidence is admissible as intrinsic evidence when it is "(1) an uncharged offense arising from the same transaction or series of transactions as the charged offense; (2) necessary to 'complete the story of the crime'; or (3) 'inextricably intertwined with the evidence regarding the charged offense.'" *Brewner*, 302 Ga. at 14, n.3 (quoting *Brooks v. State*, 298 Ga. 722, 726 (2), n.11 (783 SE2d 895) (2016)); accord *Edouard*, 485 F3d at 1344. Intrinsic evidence must also satisfy Rule 403. Id.

---

[3] For evidence of other crimes or acts to be admissible under Rule 404 (b), (1) it must be relevant to an issue other than the defendant's character; (2) it must be supported by sufficient proof to enable a jury to find by a preponderance of the evidence that the defendant committed the act(s) in question; and (3) it must satisfy Rule 403. See *State v. Jones*, 297 Ga. 156, 158-159 (1) (773 SE2d 170) (2015) (citing *Bradshaw v. State*, 296 Ga. 650, 656 (769 SE2d 892) (2015); *United States v. Edouard*, 485 F3d 1324, 1344 (11th Cir. 2007); *United States v. Delgado*, 56 F3d 1357, 1365 (III) (B) (11th Cir. 1995)). And when evidence is entered under Rule 404 (b), the prosecution is generally required to provide "reasonable notice" to the defense before the trial. OCGA § 24-4-404 (b). Notice is not required, on the other hand, when other acts evidence is introduced as intrinsic evidence, as evidence of motive, or as evidence of "prior difficulties between the accused and the alleged victim." Id.

In applying these factors, the Eleventh Circuit has noted that evidence "pertaining to the chain of events explaining the context, motive, and set-up of the crime is properly admitted if [it is] linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury." *Edouard*, 485 F3d at 1344. The court went on to explain that evidence of other acts is "inextricably intertwined" with the evidence regarding the charged offense if it forms an "integral and natural part of the witness's accounts of the circumstances surrounding the offenses for which the defendant was indicted." Id. (citation and punctuation omitted). And this sort of intrinsic evidence remains admissible "even if it incidentally places [the defendant's] character at issue." *Davis v. State*, 301 Ga. 397, 401 (3) (801 SE2d 897) (2017) (citing *Edouard*, 485 F3d at 1344; *United States v. Foster*, 889 F2d 1049, 1053 (11th Cir. 1989)).

With these principles in mind, we reject Williams's 404 (b) arguments. First, regarding the statement and testimony concerning Williams's HIV status and his sexual assault of the victim's sister, Williams's trial counsel *did* object when the prosecutor mentioned Williams's HIV status in the opening statement, resulting in a bench conference where the sexual assault

was also discussed. The trial court permitted the statements — and correctly instructed the jury that attorney statements are not evidence. As to the actual testimony, Williams's trial counsel testified at the motion for new trial hearing that he considered the challenged evidence intrinsic to the story of the crimes; he thus concluded that an objection would not be valid or sustained. This assessment was reasonable, and "[r]easonable decisions as to whether to raise a specific objection are ordinarily matters of trial strategy and provide no ground for reversal." *Ballard v. State*, 297 Ga. 248, 254 (6) (h) (773 SE2d 254) (2015) (citation and punctuation omitted).

The challenged evidence plainly pertained to the chain of events in the case and was linked by time and circumstance with the charged crimes, making the information necessary to complete the story for the jury. Williams's HIV status and sexual assault of the victim's sister helped explain to the jury why she refused his advances, the impetus for her declaration to him that it was over and they would never be alone again, and the increasing friction and conflict between the two that culminated in the crimes — including why she so feared him that she insisted that Shawn accompany her to Williams's home on the night of the murder. See, e.g., *United States v. Williams*, 564 Fed. Appx. 568, 574 (11th Cir. 2014) (testimony that

24

defendant had sex with minor victims and gave them drugs was intrinsic to charges that he recruited them into his prostitution business, and was not unduly prejudicial); *United States v. Hill*, 518 Fed. Appx. 744, 748 (11th Cir. 2013) (finding no abuse of discretion in admitting evidence that defendant participated in drive-by shooting of confidential informant's home as intrinsic to possession of drugs with intent to distribute charge because shooting occurred six days after police discovered defendant with drugs and large sum of cash, showing shooting was connected in time and circumstances); *United States v. Fortenberry*, 971 F2d 717, 721 (11th Cir. 1992) (finding no abuse of discretion in admitting evidence of defendant's participation in uncharged double murder as intrinsic to firearm possession charges because it was part of chain of events, explained context, and was not unduly prejudicial).

Because this evidence was intrinsic to the crimes charged, it was neither barred by Rule 404 (b) nor subject to the Rule's notice requirement. See *United States v. Herre*, 930 F2d 836, 838, n.1 (11th Cir. 1991). And although the evidence may have incidentally placed Williams's character at issue, its probative value was not substantially outweighed by the danger of unfair prejudice under these circumstances.

As for Williams's second Rule 404 (b) argument, pretermitting whether testimony regarding Williams's behavior while receiving medical treatment at the hospital was intrinsic to the crimes charged, Williams's trial counsel raised that behavior on cross-examination, eliciting testimony that Williams's behavior was not consistent with suicidal ideations — thus undercutting other testimony that his wounds appeared self-inflicted. This choice clearly fell within the ambit of reasonable trial strategy, even though the trial court, in overruling a subsequent objection by Williams's trial counsel, held that the defense had opened the door to further inquiry on the matter by the State. Moreover, this result would not have changed if trial counsel had based his objection on Rule 404 (b). Trial counsel was not ineffective in this respect.

Accordingly, Williams's claims of ineffective assistance of trial counsel, like his other contentions, fail.

Judgment affirmed in part and vacated in part. All the Justices concur.

Decided October 30, 2017.

Murder. Clarke Superior Court. Before Judge Sweat.

David D. Marshall, for appellant.

Kenneth W. Mauldin, District Attorney, Brian V. Patterson, Jon R. Forwood, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew M. Youn, Assistant Attorney General, for appellee.