313 Ga. 81
FINAL COPY

S21A1127. JENKINS v. THE STATE.

LaGrua, Justice.

Appellant Devon Jenkins was convicted of felony murder and other crimes in connection with an August 6, 2014 home invasion in Gwinnett County in which the victim, Adam Schrier, was shot and killed and two other victims, including a child, were injured. On appeal, Appellant contends that the evidence was legally insufficient to support his conviction for possession of a firearm by a convicted felon, that the trial court erred in admitting other-act evidence prohibited by OCGA § 24-4-404 (b), and that his trial counsel rendered ineffective assistance by failing to request a limiting instruction on the other-act evidence.[1] For the reasons that

---

[1] In November 2014, Appellant was indicted by a Gwinnett County grand jury, together with four other indictees – Brian Brewner, James Stokes, Jonathan Pichardo, and Pierre Scott – on charges of malice murder, felony murder, aggravated assault, first-degree burglary, first-degree home invasion, conspiracy to commit robbery, armed robbery, false imprisonment, first-degree cruelty to children, and possession of a firearm by a convicted felon. Appellant was re-indicted for the same offenses in August 2015. In February 2016, Appellant was tried jointly with Stokes and Scott. Appellant was convicted of

follow, we affirm Appellant's convictions.

1. Viewed in the light most favorable to the verdicts, the evidence presented at Appellant's trial showed that during the early morning hours of August 6, 2014, several intruders forcibly entered Schrier's home in Duluth. Schrier shared the home with his four-year-old daughter, E. S., his girlfriend, Jami Smith, and Smith's eight-year-old daughter, M. S. That morning, Smith woke up at 5:30 and was smoking a cigarette in the basement-level garage when she heard banging noises above her from the main floor of the house. Smith stepped inside the house and yelled for Schrier. She started to walk up the stairs leading from the basement to the main floor when she heard Schrier cry out, followed by booming sounds. Smith called for Schrier again, and then a man — whom Smith identified

---

all counts except malice murder. The trial court sentenced Appellant to life in prison without the possibility of parole, plus a total of 50 consecutive years to serve. Appellant filed a timely motion for new trial on March 1, 2016, which he amended through new counsel on July 2, 2018, and again on May 19, 2019. On February 5, 2020, the trial court held an evidentiary hearing on the motion for new trial, and on March 3, 2020, the trial court denied Appellant's motion for new trial. Appellant filed a timely notice of appeal to this Court on March 10, 2020. The case was docketed to this Court's term beginning in August 2021 and orally argued on November 9, 2021.

at trial as Appellant — appeared in the doorway at the top of the basement stairs, pointing a gun at her. Appellant charged at Smith and hit her in the head multiple times with the butt of his gun, asking, "Where's the f***ing money at?" When Smith responded that she did not know what he was talking about, Appellant shot her in the left leg and dragged her up the stairs, continuing to ask where the money was.

When they reached the main floor, Smith saw another man pulling M. S. downstairs from the second floor of the house where the bedrooms were located.[2] The men forced Smith and M. S. into the living room where Schrier, who had been shot in the chest, was lying on his back on the floor. Appellant directed Smith and M. S. to lie down on their stomachs on the floor next to Schrier and demanded that Smith give the men $40,000 they had been told was in the home. Smith again said she did not know anything about the

---

[2] According to M. S., she had been asleep in her bed when she heard a loud yell and glass breaking. M. S. opened her door and saw two men whom she did not recognize staring at her. She quickly closed the door and tried to press against it, but the men pushed the door open and dragged her downstairs to the main level.

money, but said she had $60 in her purse upstairs, which the men took.

The men bound Smith's and M. S.'s arms and legs with duct tape. As the men were doing so, M. S. knocked the tape away, and Appellant started shooting at Smith and M. S. Smith tried to cover M. S. to protect her, and a bullet grazed Smith's shoulder and entered M. S.'s arm. The men finished binding Smith's and M.S.'s arms and legs and left the house. Smith could not stand because of the gunshot wound to her leg, but she was able to free M.S.'s legs from the duct tape. M. S. then retrieved Smith's cell phone from upstairs, and Smith called 911. Police officers and paramedics soon responded, and Smith and M. S. were transported to a hospital and treated for their injuries. Schrier died at the scene from a gunshot wound to the chest.

Following the home invasion, neighbors of Schrier reported seeing a light-colored or white Dodge pickup truck parked outside Schrier's home with the engine running and the lights off. One of the neighbors, who was suspicious, wrote down the Tennessee tag

number of the truck and later reported it to police.

The home invasion was the result of a series of drug-related incidents that occurred in July and August 2014. In mid-July, law enforcement officers conducted a drug raid at the Gwinnett County apartment of Becky Banner, a woman who was trafficking methamphetamine supplied by a drug cartel. During the drug raid, Becky's son, Bryan Banner, who also trafficked methamphetamine, drove to his mother's residence. When Bryan arrived, he saw a K-9 unit at the door to his mother's apartment and realized what was happening. He immediately drove to Becky's other residence in Gwinnett County and retrieved five kilograms (11 pounds) of methamphetamine that Becky was storing in a Chevrolet Blazer parked outside the second residence. After retrieving the drugs, Bryan asked Schrier — a close friend — to hide the drugs for him. Schrier agreed and stored the drugs in a storage unit near his home.

Over the next week, Bryan sold most of the methamphetamine Schrier was storing for him. One of the individuals who purchased the drugs was Jamie Staples, Becky's then-boyfriend and a minor

5

drug dealer connected to the trafficking operation.  Staples knew Bryan had taken all of the drugs hidden in the Blazer, but he mistakenly believed that Bryan was storing the remainder of the drugs and all the money from the drug sales inside Schrier's home. The week before the August 6 home invasion, Staples met with Brian Brewner, one of Appellant's co-indictees who was also a drug dealer, to discuss stealing the rest of the methamphetamine and any money generated from the drug sales from inside Schrier's home. Brewner then approached Appellant and Pierre Scott, one of Appellant's co-defendants, to solicit their help in stealing the money and drugs from Schrier's home.

On the night of the home invasion, Brewner met with Appellant and Scott at a La Quinta hotel in Gwinnett County where Brewner was staying with his girlfriend, Charlice Roberts. Appellant was also staying at this hotel with his girlfriend, Summer Lawrence.  During this meeting, the men finalized the plot to invade Schrier's home to steal the drugs and money.  After the meeting, Roberts noted that Appellant was carrying a gun and was visibly

6

excited about getting some money.

Around 1:00 or 2:00 a.m. on August 6, Appellant left the hotel room he was sharing with Lawrence, and Lawrence saw him get into a white pickup truck with Scott and his other co-defendant, James Stokes. Appellant was carrying a large black duffel bag. After sunrise that morning, Appellant returned to the hotel and went to sleep without speaking to Lawrence. The next day, after moving to another hotel, Appellant told Lawrence that the night they left, he shot a man after they tried to rob him and "the man tried to fight him." He also said that "he didn't shoot the girl, and he didn't shoot the older kid." Appellant insisted he did not want Lawrence "to get caught up in it," and he wanted to go to Chicago.

On the night after the home invasion, Bryan Banner contacted the police and told them he had information on the "possible home invasion/homicide" at Schrier's home. Bryan implicated Jamie Staples in these crimes, suggesting that the motive was to steal methamphetamine and money generated from the sale of methamphetamine Schrier had been storing at or near his home.

On August 15, investigators with the Gwinnett County District Attorney's Office learned that the white Dodge pickup truck seen parked outside Schrier's home near the time of the home invasion had been rented from a Chattanooga, Tennessee rental car company in July by a woman named Shana Woods. When investigators interviewed Woods, she informed them that she had rented the Dodge Ram for Brian Brewner to use.[3] Investigators also discovered that, on the afternoon of August 6, the pickup truck had been parked at the Congress hotel – a hotel adjacent to the La Quinta hotel in Gwinnett County where Appellant and Brewner were staying the night before the home invasion. Surveillance video from the Congress hotel also showed that on the morning of August 6, a white Dodge pickup truck, followed by a white Toyota Camry with tinted windows, pulled into the hotel parking lot at 6:35 a.m. Shortly after pulling into the parking lot, three men exited the pickup truck and

---

[3] At trial, Lawrence testified that the white pickup truck she saw at the La Quinta hotel on August 6 belonged to Brewner, and she described it as "the way everybody was getting around, I guess helping each other out." A cigarette butt discovered by police on the floorboard of the pickup truck later tested positive for Appellant's DNA.

8

got into the Camry, which then drove away. At that time, Brewner's girlfriend, Roberts, owned a white Toyota Camry with tinted windows.

On August 21, Staples was arrested on unrelated drug charges. Staples implicated Brewner in the home invasion and told the police where they could find Brewner. Later that night, police officers located Brewner and Roberts in the parking lot of a hotel in DeKalb County. As the police officers approached, Brewner fled the area in a white SUV, but Roberts remained and was brought in for questioning. During Roberts's interview, she told the police officers that Appellant and Brewner were involved in the home invasion. Warrants were then issued for Appellant's and Brewner's arrest. Police officers also released information about the arrest warrants to the media, which increased media coverage and publicity about the home invasion.

On the night of August 27, Sneh Sean Savice, an acquaintance of Appellant who regularly purchased marijuana from him, picked up Appellant in Atlanta to give him a ride to Lawrenceville. When

9

Appellant first got into Savice's car, Savice heard Appellant do a Google voice search for a Duluth homicide or home invasion. While they were traveling, the men encountered a roadblock with a number of police cars, and Appellant told Savice to turn around. Savice made a U-turn in the middle of the street, at which point the police officers started pursuing his car. Savice was initially driving the speed limit, but Appellant pulled a gun and pointed it at Savice, instructing him to get away from the police officers. Savice sped up, and Appellant directed him into a residential area. The men soon realized the police officers were no longer behind them, and Savice stopped the car. Appellant jumped out of the car and ran.

Shortly after this incident, Kristian Dunning, a friend of Appellant's with whom Lawrence used to reside, spoke to Appellant on the phone. During this conversation, Appellant told Dunning "everything" about "the crime he had done" and asked her to do a search on her phone for his name and "Fox 5" because he "knew he was wanted." Dunning testified that she did the search as requested, and when she did so, news about the home invasion

appeared, including information that "the wife was shot, and the daughter was shot, and the husband was actually killed," that three suspects had been found, and that the police were looking for "someone else." Dunning asked Appellant what happened, and he said that "things just went – it didn't go the way it was supposed to go." Appellant then admitted that he shot "the man" and that he didn't know who shot the wife or child, but that "[i]t happened so fast." Appellant also told Dunning about the roadblock and the police chase in Savice's car, explaining that he knew he was wanted for the home invasion, so he pointed the gun at Savice and told him to drive away from the roadblock. On August 28, Dunning contacted the police and told them where they could find Appellant. Appellant was arrested shortly thereafter.

During his incarceration prior to trial, Appellant confided in his cellmate that he was involved in the "Duluth home invasion." Appellant said they were trying to steal drugs for a man who was involved with "the cartel," that he got into a fight with the victim during the home invasion, and that he participated in it because he

11

was "broke" and was just "looking to make some money" by "any means necessary."

2. Appellant first contends that the evidence presented at trial was insufficient to support his conviction for possession of a firearm by a convicted felon. We disagree.

Count 23 of the indictment charged Appellant with possession of a firearm by a convicted felon, stating that

> on the 6th day of August, 2014, [Appellant] did then and there unlawfully possess a firearm after having been convicted on the 1st day of December, 2010, in the Superior Court of Gwinnett County, a court of competent jurisdiction, of the offense of Theft by Receiving Stolen Property, a felony under the laws of this State. . . .

At a pretrial hearing in November 2015, Appellant agreed to stipulate to the 2010 theft-by-receiving felony conviction if the State redacted this conviction from the firearm possession charge in the indictment given to the jury. The parties so stipulated, and the indictment was redacted to replace the name of the predicate felony with "felony offense under the laws of this State."

At trial, the parties agreed to a written stipulation to be read

to the jury, and the trial court read the following stipulation and instructions to the jury:

> The parties have entered into a stipulation that has been approved by the Court about the following facts: And that is, that Devon Jenkins, James Stokes, and Pierre Scott are all convicted felons. When a party stipulates facts, this is in the nature of evidence. You may take that fact or those facts as a given without the necessity of further proof; however, you are not required to do so, and even such matters may be contradicted by other evidence. You make all the decisions, as the jury, based on the evidence in this case.

After the close of evidence, the trial court instructed the jury as follows:

> You have received in evidence prior convictions of the defendants and certain witnesses. You may consider this evidence only insofar as it relates to attacking the credibility of the witness and/or the required element of conviction of a felony for the offense in Counts 23, 25, and 26 of the indictment, and not for any other purpose or count.

The trial court then reminded the jury that the parties stipulated to the fact that "each defendant is a convicted felon" and repeated the general instruction regarding stipulations given during trial.

On appeal, Appellant claims that, because the stipulation did

not specify that Appellant was a convicted felon on or before the home invasion on August 6, 2014, it was insufficient as a matter of law to establish that his felony conviction preceded the gun possession – a  necessary element of OCGA § 16-11-131.[4] Appellant claims that, because the stipulation was in the present tense, it allowed for the reasonable hypothesis that Appellant was convicted of a felony after August 6, 2014, and thus, reasonable doubt existed as a matter of law as to whether he was a convicted felon on the date of the crimes.

When evaluating challenges to the sufficiency of the evidence as a matter of constitutional due process, "we view the evidence presented at trial in the light most favorable to the verdicts and ask whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted." *Boyd v. State*, 306 Ga. 204, 207 (1) (830 SE2d 160) (2019) (citing *Jackson v. Virginia*, 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d

---

[4] OCGA § 16-11-131 (b) provides in pertinent part that "[a]ny person . . . who has been convicted of a felony by a court of this state . . . and who receives, possesses, or transports any firearm commits a felony[.]"

14

560) (1979), and *Jones v. State*, 304 Ga. 594, 598 (820 SE2d 696) (2018)). "A criminal defendant may expressly authorize factual stipulations that will obviate the need for proof." *Thompson v. State*, 277 Ga. 102, 103-104 (2) (586 SE2d 231) (2003).

In this case, the trial court read the written stipulation to the jury with no objection from either party, and though the stipulation was worded in the present tense, the purpose of the stipulation was clear — to eliminate "the necessity of further proof" of "the required element of conviction of a felony" for the felon-in-possession counts, as the jury was later instructed. No alternative hypothesis was presented to the jury in the evidence, closing arguments, or jury instructions to suggest that Appellant was not a convicted felon at the time of the home invasion. Thus, the jury was authorized to accept the stipulation, to infer that Appellant's felony conviction occurred before the events alleged in the indictment, and to find Appellant guilty of possession of a firearm by a convicted felon. See *McKie v. State*, 306 Ga. 111, 115 (829 SE2d 376) (2019) ("Where the jury is authorized to find the evidence sufficient to exclude every

15

reasonable hypothesis save that of the accused's guilt, this Court will not disturb that finding unless it is insupportable as a matter of law." (citation and punctuation omitted)). We therefore conclude that the evidence was constitutionally sufficient under *Jackson v. Virginia* for a jury to find Appellant guilty beyond a reasonable doubt of possession of a firearm by a convicted felon. See *Jackson*, 443 U. S. at 319.

3. Appellant next contends that the trial court erred by admitting trial testimony from State witnesses regarding Appellant's actions shortly before and after he encountered the police roadblock with Savice in late August 2014 because this evidence was prohibited by OCGA § 24-4-404 (b) ("Rule 404 (b)").[5]

Prior to trial, Appellant filed a motion in limine seeking to exclude this testimony, arguing that the evidence was irrelevant, was inadmissible as "just pure bad acts," and did not go to "explaining flight or anything of that nature" because "it was well

---

[5] Under Rule 404 (b), "[e]vidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes[.]"

16

after the home invasion." The State contended that the testimony was admissible as evidence of flight and to demonstrate that Appellant was aware of his status as a suspect in the home invasion. The trial court withheld ruling on Appellant's motion in limine until the testimony at issue was presented at trial.

During the trial, the court readdressed Appellant's motion in limine outside the presence of the jury, and Savice and Dunning made a proffer of the contents of their potential testimony. The trial court then heard arguments from both sides about whether the testimony fell under the ambit of Rule 404 (b) and whether it should have been included in a pre-trial notice to Appellant.[6] The trial court concluded that the evidence was admissible — implicitly concluding it was intrinsic evidence — to demonstrate that Appellant fled from the police roadblock to avoid capture for the home invasion and was

---

[6] Rule 404 (b) provides that "[t]he prosecution in a criminal proceeding shall provide reasonable notice to the defense in advance of trial, unless pretrial notice is excused by the court upon good cause shown, of the general nature of any such evidence it intends to introduce at trial," but that "[n]otice shall not be required when the evidence of prior crimes, wrongs, or acts is offered to prove the circumstances immediately surrounding the charged crime, motive, or prior difficulties between the accused and the alleged victim."

17

not subject to Rule 404 (b).

On appeal, Appellant claims that this testimony should have been excluded under Rule 404 (b) because it was impermissible character evidence and was unrelated to the crimes for which he was charged. Appellant further claims that the trial court failed to conduct the proper balancing test under OCGA § 24-4-403 ("Rule 403")[7] or make any ruling as to the probative value of this evidence, which Appellant asserts was "very low." The State asserts that while the trial court did not explicitly state that it conducted a Rule 403 balancing test, the trial court clearly determined that the evidence was relevant to the case and probative of the possibility that Appellant was fleeing from arrest, and thus the trial court did not abuse its discretion in admitting the evidence of flight "without subjecting it to analysis as other act evidence contemplated by [Rule 404 (b)]."

---

[7] Under Rule 403, "[r]elevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

18

We agree and conclude that the evidence was properly admitted as flight evidence, which is generally intrinsic and not subject to Rule 404 (b). See *Rawls v. State*, 310 Ga. 209, 218-219 (4) (a) (850 SE2d 90) (2020) (holding that "evidence of flight may be admissible as circumstantial evidence of guilt"). See also *Williams v. State*, 302 Ga. 474, 485 (IV) (d) (807 SE2d 350) (2017) ("The limitations and prohibition on 'other acts' evidence set out in [Rule 404 (b)] do not apply to intrinsic evidence." (citations and punctuation omitted)).

> Evidence is admissible as intrinsic evidence when it is (1) an uncharged offense arising from the same transaction or series of transactions as the charged offense; (2) necessary to complete the story of the crime; or (3) inextricably intertwined with the evidence regarding the charged offense.

*Williams*, 302 Ga. at 485 (IV) (d) (citations and punctuation omitted). Evidence of flight is generally intrinsic, as "'the fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, (is) admissible as evidence of consciousness of guilt [for the charged

19

offense], and thus of guilt itself.'" *State v. Orr*, 305 Ga. 729, 741 (4) (a) (827 SE2d 892) (2019) (quoting *United States v. Borders*, 693 F2d 1318, 1324-1325 (II) (11th Cir. 1982) ("Flight is viewed in the law of evidence as admission by conduct which expresses consciousness of guilt.")). We acknowledge that interpretations of an "act of flight should be made cautiously and with a sensitivity to the facts of the particular case, including whether the defendant was aware that he was under investigation or had other reasons to flee and the timing of the flight." Id. at 742 (4) (b) (citation and punctuation omitted). And, we note that flight evidence may be inadmissible where "there exists a significant time delay from the commission of the crime, or the point at which the suspect becomes aware that he is the subject of a criminal investigation, to the time of flight." *Borders*, 693 F2d at 1326 (II). However, no such impediments exist in this case.

Although Appellant's act of fleeing from the police roadblock occurred three weeks after the home invasion, the record shows that the home invasion had become highly publicized at that point, and Savice testified that he heard Appellant search for information on

20

his cell phone about a Duluth homicide/home invasion shortly before the men encountered the roadblock. Then, according to Savice, when they saw the police, Appellant forced Savice at gunpoint to evade them. The record further demonstrates that, at the time of these events, Appellant knew he was wanted by the police for his involvement in the home invasion — he told Dunning as much. See *Borders*, 693 F2d at 1326 (II) (concluding that where "the instinctive or impulsive character of the defendant's behavior . . . indicates fear of apprehension," it "gives evidence of flight such trustworthiness as it possesses"). Thus, this evidence of Appellant's flight from the roadblock to avoid being apprehended for the home invasion was part of the same "chain of events" and "inextricably intertwined" with the home invasion itself, despite the approximately three-week interval between the two incidents. *Williams*, 302 Ga. at 486 (IV) (d). See also *Harris v. State*, 310 Ga. 372, 381 (2) (b) (850 SE2d 77) (2020) ("[T]here is no bright-line rule regarding how close in time evidence must be to the charged offenses, or requiring evidence to pertain directly to the victims of the charged offenses, for that

21

evidence to be admitted properly as intrinsic evidence.").

With these considerations in mind, we conclude that the testimony from Savice and Dunning was properly admitted as intrinsic evidence of flight. And, although Rule 403 grants a trial court discretion to exclude relevant evidence "if its probative value is substantially outweighed" by its prejudicial effect, this Court has repeatedly explained that "exclusion of evidence under Rule 403 is an extraordinary remedy that should be used only sparingly," and the party seeking to exclude the evidence must show that the probative value of the relevant evidence is "substantially outweighed by the danger of unfair prejudice." *Orr*, 305 Ga. At 737 (3), 742 (4) (b) (citation and punctuation omitted). Appellant did not meet that burden here.

> Generally speaking, the greater the tendency to make the existence of a fact more or less probable, the greater the probative value. And the extent to which evidence tends to make the existence of a fact more or less probable depends significantly on the quality of the evidence and the strength of its logical connection to the fact for which it is offered.

*Olds v. State*, 299 Ga. 65, 75 (2) (786 SE2d 633) (2016) (citation

omitted). In this case, any prejudicial impact from the flight evidence presented was outweighed by its probative value, as the evidence showed that Appellant had a guilty conscience for his participation in the home invasion and wanted to avoid being apprehended.

Therefore, the trial court did not abuse its discretion in admitting evidence that Appellant fled the roadblock, as it was not inadmissible under Rule 403. See *Harris*, 310 Ga. at 377 (2) (b) (holding that the trial court did not abuse its discretion in admitting the State's evidence as intrinsic evidence). And, even if the trial court had erred in admitting this evidence, any such error was harmless given the weight of the other evidence admitted against Appellant at trial, including statements from his co-indictees, Appellant's confessions to his cell-mate and other acquaintances, an in-court identification by one of the victims of Appellant as the perpetrator, and Appellant's DNA evidence from a cigarette found inside the white Dodge Ram used in the home invasion. See *Fitts v. State*, 312 Ga. 134, 138 (1) (859 SE2d 79) (2021) ("The test for

determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict," and "[w]hen applying a harmless-error analysis, we review the evidence de novo and weigh it as a reasonable juror would rather than in a light most favorable to upholding the jury's guilty verdict.") (citation and punctuation omitted).

4. Appellant's final contention is that his trial counsel was ineffective for failing to request a jury instruction indicating that the roadblock evidence was being admitted for the limited purpose of proving flight. We disagree.

In order to prevail on a claim of ineffective assistance of counsel, Appellant must show "both that counsel's performance was deficient, and that the deficient performance was prejudicial to his defense." *Lockhart v. State*, 298 Ga. 384, 385 (2) (782 SE2d 245) (2016). See also *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). Here, in denying Appellant's motion for new trial, the trial court ruled that the roadblock evidence was not subject to Rule 404 (b) and that the court had

properly charged the jury as to all issues in the case, including giving a charge on direct and circumstantial evidence.

Accordingly, because the evidence at issue was properly admitted as intrinsic evidence of flight, which is not subject to Rule 404 (b), and because we see no other basis for giving a limiting instruction in this case, Appellant "fails to show that a request for a limiting instruction would have been granted, and thus fails to establish ineffective assistance of counsel on this basis." *Adams v. State*, 283 Ga. 298, 300 (3) (b) (658 SE2d 627) (2008). Therefore, we conclude that Appellant failed to show deficient performance under *Strickland*, and his ineffective assistance of counsel claim fails.

*Judgment affirmed. All the Justices concur.*

Decided January 19, 2022.

Murder. Gwinnett Superior Court. Before Judge Hamil.

*Clark & Towne, David E. Clark*, for appellant.

*Patsy Austin-Gatson, District Attorney, Christopher M. DeNeve, Lee F. Tittsworth, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Mark S. Lindemann, Assistant Attorney General*, for appellee.