**FIFTH DIVISION**
**RICKMAN, C. J.,**
**MCFADDEN, P. J., and SENIOR APPELLATE JUDGE PHIPPS**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules

*DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.*

**October 7, 2021**

# In the Court of Appeals of Georgia

A21A0756. PASS v. THE STATE.

RICKMAN, Chief Judge.

Following a jury trial, Terrio Pass was convicted in Clarke County Superior Court of obstruction of an officer, giving a false name to a law enforcement officer, and driving without a license. Pass now appeals from the denial of his motion for a new trial, arguing that the trial court erred in denying his motion to suppress evidence obtained as the result of an allegedly illegal traffic stop. He further asserts that trial counsel's decision to concede his guilt on several misdemeanor counts of the indictment deprived Pass of his Sixth Amendment rights and constituted a structural error requiring a new trial. For reasons explained more fully below, we find no error and affirm.

"On appeal from a criminal conviction, the defendant is no longer entitled to a presumption of innocence and we therefore construe the evidence in the light most favorable to the jury's guilty verdict." *Maddox v. State*, 346 Ga. App. 674, 675 (816 SE2d 796) (2018) (citation and punctuation omitted). So viewed, the record shows that Athens-Clarke County police conducted a traffic stop of a vehicle driven by Pass after it turned in front of an officer's oncoming vehicle. The stop was based on the officer's belief that Pass's vehicle had failed to stop at a stop sign and had traveled outside its lane line when making the turn. When the officer asked for Pass's name and driver's license, Pass could not produce a license and he identified himself as Marco Pass.[1] The officer then obtained an electronic copy of Marco Pass's driver's license and saw that the man pictured on the license was not Terrio Pass. He asked Pass for his "real name" several times, but Pass continued to insist that his first name was Marco. Eventually, the officer decided to arrest Pass for providing a false name to law enforcement and asked Pass to step out of the car. Although Pass initially cooperated with the officer, he eventually fled the scene on foot, with both the arresting officer and a backup officer giving chase. The chase went down a commercial driveway and through a fence, and as he was pursuing Pass, the arresting

---

[1] Marco Pass is the name of Terrio Pass's cousin.

2

officer saw Pass's hands going into his front pockets. The pursuit ended at a corner of the commercial property bordered by barbed wire fence, and the arresting officer observed Pass possibly throwing something over the fence.

Once police apprehended Pass, he continued to resist arrest, but officers were eventually able to restrain him. After placing Pass in handcuffs, the arresting officer searched the area just over the barbed wire fence and found a small plastic bag containing a white powdery substance and several one-dollar bills. Although it had been raining all day, both the bag and the cash were dry. During a search of Pass incident to arrest, police found more cash[2] and a leafy green substance. As they escorted Pass back to the car along the path of the chase, police located more cash, a digital scale, and a cell phone. Forensic chemical analysis showed that the white powdery substance recovered at the scene was cocaine weighing approximately 1.53 grams. Chemical tests also showed that the leafy green substance found in Pass's pocket was marijuana weighing approximately .01 ounces.

Based on the foregoing evidence, Pass was charged by accusation with possession of cocaine with intent to distribute, possession of less than one ounce of

---

[2] Police recovered a total of $118 cash from Pass's person and the area surrounding the chase.

3

marijuana, obstruction of an officer, giving false information to a law enforcement officer, driving without a license, and failure to stop at a stop sign.

Prior to trial, Pass filed a motion to suppress all evidence obtained as a result of the traffic stop, arguing that police lacked a legitimate basis for the stop. At the hearing on the motion to suppress, the arresting officer testified that the stop was based on his observation of Pass's less-safe driving, including his failure to stop at the stop sign and his failure to maintain his lane as he made the turn. Additionally, the State introduced into evidence the video from the officer's body camera and played it for the court. The court denied the motion to suppress, finding that the video evidence showed both that Pass failed to come to a complete stop at the stop sign and that he made an improper right turn.

At trial, videos from the body cameras of both the arresting and back-up officers were introduced into evidence at trial and played for the jury. During his testimony, the arresting officer pointed out to the jury where on the video Pass failed to come to a complete stop at the stop sign and where his car veered outside its lane of travel and into the center turn lane. Additionally, the parties agreed to stipulate that at the time of the incident, Pass did not have "a valid driver's license for the type and class class of vehicle he was driving as required by Georgia law." Before reading that

4

stipulation to the jury as part of the charge, the trial court read it aloud to the parties to ensure they were in agreement with it. Trial counsel stated on the record that Pass agreed to that stipulation, and Pass made no comment.

During her opening statement, trial counsel told the jury: "We don't dispute that [Pass] gave a false name. We don't dispute that he didn't have a driver's license back then. We don't dispute that he panicked and he ran because he was going to be going to jail for those offenses." Additionally, during closing argument, trial counsel again conceded that Pass had no driver's license when he was pulled over, that he gave police a false name, and that he fled from police. Trial counsel then concluded her argument by saying to the jury:

> I hope you'll do the right thing by my client and return a verdict of not guilty on the cocaine charges, and to do as you think the law not only authorizes you but you think is the right thing for you to do on these lesser offenses, which may be to find him not guilty of everything, given [your] total experience, or maybe it is to find him guilty of some of those [lesser offenses]. But I entrust him now to you.

The jury found Pass guilty of obstruction of an officer, giving a false name to a law enforcement officer, and driving without a license. The jury acquitted Pass, however, of possession of cocaine with intent to distribute (as well as the lesser

5

included offense of possession of cocaine), possession of less than one ounce of marijuana, and failure to stop at a stop sign.

Following his conviction, Pass filed a motion for new trial. Pass waived his right to be present at the hearing on that motion and specifically declined to ask for a continuance so that he could be present. Pass's trial counsel testified at the hearing that once they lost the motion to suppress, her trial strategy was to admit the conduct on which the charges of giving a false name to police, obstruction, and driving without a license were based. She further explained that this conduct was plainly visible on the videos that were played at trial, so by conceding that conduct she hoped to build goodwill and credibility with the jury. When asked if Pass consented to the strategy, trial counsel testified that she conferred with Pass regarding the proposed stipulation that he was driving without a license and that Pass initially objected. Counsel then "had a pretty pointed conversation" with Pass "about why I thought [the stipulation] helped me make a case [for the defense]." With respect to the concession she made during her opening and closing statements, trial counsel reiterated that those concessions involved facts that were not in dispute, so she instead focused her arguments on how the jury should view the facts, hoping those arguments would help lead to an acquittal. Trial counsel acknowledged that Pass did not like the fact that

6

she admitted he had done "wrongful things" on the night in question. She further admitted that she never told Pass she could not make those arguments if he expressly told her not to. She did, however, explain to Pass that she understood he did not like the strategy of conceding the conduct in question, but that she really needed to employ that strategy. Additionally, trial counsel explained that Pass never forbade her from pursuing the strategy, even though he did not like it.

Following the hearing, the trial court denied Pass's new trial motion, and Pass now appeals from that order.

1. Pass contends that the trial court erred in denying his motion to suppress the evidence resulting from the traffic stop. When reviewing a trial court's ruling on a motion to suppress, "we review the trial court's factual findings for clear error and its legal conclusions de novo." (Citation and punctuation omitted). *White v. State*, 307 Ga. 601, 602 (2) (837 SE2d 838) (2020). And in conducting our review, we construe the evidence "in the light most favorable to the trial court's factual findings and judgment" and we generally limit our "consideration of the disputed facts to those expressly found by the trial court." (Citation and punctuation omitted.) Id.

A traffic stop is justified where police have observed "even [a] minor traffic violation." *Loveless v. State*, 337 Ga. App. 894, 897 (1) (789 SE2d 244) (2016). Here,

7

Pass contends that police had no justification for the stop because the video from the arresting officer's body camera showed that Pass stopped at the stop sign. In its order denying the motion to suppress, however, the trial court found that the traffic stop was justified by the officer's observation of two separate traffic violations. Specifically, the court found that the video showed both that Pass failed to come to a complete stop and that he made an improper right turn (i.e., when turning, his car veered out of its lane of travel). On appeal, Pass does not challenge the trial court's finding that he made an improper right turn. Given that the improper turn, standing alone, provided a basis for the traffic stop, the trial court did not err in denying the motion to suppress. See *State v. Williams*, 354 Ga. App. 418, 422 (841 SE2d 66) (2020) ("when an officer witnesses a traffic offense, a resulting traffic stop does not violate the Fourth Amendment, regardless of the officer's motives for initiating the stop"); *Green v. State*, 282 Ga. App. 5, 7 (1) (637 SE2d 498) (2006) (a motion to suppress challenging the validity of a traffic stop must fail where a law enforcement officer witnesses even a minor traffic violation).

2. Pass argues that his trial counsel's strategic decision to concede Pass's guilt on the charges of obstructing an officer, giving a false name to a law enforcement officer, and driving without a license constitute a structural error requiring a new trial.

8

In support of this argument, Pass relies on the United States Supreme Court's decision in *McCoy v. Louisiana*, ___ U. S. ___ (138 SCt 1500, 200 LE2d 821) (2018). *McCoy* held that the Sixth Amendment guarantees a defendant in a capital case[3] the "[a]utonomy to decide . . . the objective of [his] defense," including whether he should maintain his innocence even in the face of overwhelming evidence. 138 SCt at 1508 (II) (A). The Court further held that a violation of a defendant's right to determine the objective of his defense constitutes a structural error requiring a new trial regardless of whether the defendant suffered prejudice.[4] Id. at 1511 (III). Thus,

---

[3] As this Court has explained previously, "there is some uncertainty as to whether *McCoy*'s holding extends to non-capital cases." *Harris v. State*, 358 Ga. App. 802, 809 (1) n.7 (856 SE2d 378) (2021), citing *United States v. Rosemond*, 322 FSupp3d 482, 486 (S.D. N.Y. 2018) ("While the Court well understands Rosemond's contention that the narrow holding of *McCoy* should be extended beyond capital cases and that this question will be resolved in due course by appellate courts, there is no need to decide it here."), aff'd, *United States v. Rosemond*, 958 F3d 111 (2nd Cir. 2020). See also See *McCoy*, 138 SCt at 1514 ("[I]t is hard to see how the right [to autonomy] could come into play in any case other than a capital case in which the jury must decide both guilt and punishment.") (J. Alito, dissenting). For purposes of this appeal, we assume that the holding in *McCoy* also applies in non-capital cases.

[4] Structural error "affects the framework within which the trial proceeds, as distinguished from a lapse or flaw that is simply an error in the trial process itself." (Citation and punctuation omitted.) *McCoy*, 138 SCt at 1511 (III). A structural error may be found where: (1) the right violated "is not designed to protect the defendant from erroneous conviction but instead protects some other interest, such as the fundamental legal principle that a defendant must be allowed to make his own choices about the proper way to protect his own liberty"; (2) the impact of the error is "too

9

the Court concluded that defense counsel's insistence on conceding McCoy's guilt during opening and closing arguments over his client's "intransigent and unambiguous objection" to such a strategy violated McCoy's Sixth Amendment rights and entitled him to a new trial.[5] *McCoy*, 138 SCt at 1507 (I), 1511 (III).

Here, Pass argues that trial counsel's testimony at the hearing on the motion for new trial, that Pass was generally opposed to the idea of conceding he engaged in any wrongful conduct, shows that trial counsel usurped his fundamental decision to decide the objective of his defense -- i.e., to maintain his innocence and pursue an acquittal on all charges. And Pass further contends that under *McCoy*, his attorney's

---

hard to measure, as is true of the right to counsel of choice"; or (3) the error results in "fundamental unfairness," as when a judge fails "to tell the jury that it may not convict unless it finds the defendant's guilt beyond a reasonable doubt." (Citations and punctuation omitted.) Id.

[5] McCoy had been charged with the first-degree murder of his estranged wife's relatives. *McCoy*, 138 SCt at 1505-1506 (I). Given the overwhelming evidence against his client, trial counsel believed that unless they conceded at the guilt phase of trial that McCoy was the perpetrator of the crimes, a death sentence would be impossible to avoid during the penalty phase. Id. at 1506 (I). When counsel discussed this strategy with McCoy, however, McCoy explicitly instructed counsel not to concede his guilt and insisted that counsel maintain his innocence and seek an acquittal. Id. After his attorney conceded during opening argument that McCoy had caused the victims's deaths, McCoy immediately protested and outside the jury's presence, he reiterated to the trial court his objection to trial counsel's strategy. Id. at 1506-1507 (I).

conduct resulted in a structural error, requiring that he be granted a new trial. We disagree.

As this Court recently explained, "nothing in the Court's holding [in *McCoy*] requires counsel to obtain the express consent of a defendant before conceding guilt." *Harris v. State*, 358 Ga. App. 802, 808 (1) (856 SE2d 378) (2021). See also *Florida v. Nixon*, 543 U. S. 175, 187 (125 SCt 551, 160 LEd2d 565) (2004) (although trial counsel "undoubtedly has a duty to consult with the client regarding 'important decisions,' including questions of overarching defense strategy," trial counsel is not obligated to obtain client consent as to decisions regarding trial strategy); *Anthony v. State*, 311 Ga. 293, 299 (5) (857 SE2d 682) (2021) ("[c]ounsel's strategic choice to concede guilt . . . is not impeded by any blanket rule demanding the defendant's explicit consent") (citation and punctuation omitted). Thus, the fact that trial counsel did not obtain Pass's express consent to the strategy of conceding guilt on some of the lesser charges does not, without more, constitute structural error. See *McCoy*, 138 SCt at 1509 (II) (B).

Instead, *McCoy* makes clear that structural error occurs only where counsel concedes his client's guilt to one or more charges despite the client's "intransigent and unambiguous objection" to this strategy. *McCoy*, 138 SCt at 1507 (I). And here,

11

Pass, who neither appeared nor testified at the new trial hearing, presented no evidence that he voiced such an objection. The only evidence on this issue was the testimony of trial counsel, who acknowledged that although Pass was not happy with the strategy, he never forbade her to use it And Pass did not prevent counsel from relying on this strategy even after she made it clear to him that, despite his reservations, she planned to employ it. Nor did Pass voice any objections to the trial court, even when it inquired as to whether Pass agreed to the proposed stipulation that he was driving without a license. Given these circumstances, we find that trial counsel's strategic decision to concede guilt on some of the misdemeanors with which Pass was charged did not constitute structural error requiring a new trial.

For the reasons set forth above, we affirm the trial court's order denying Pass's motion for a new trial.

*Judgment affirmed. McFadden, P. J., and Senior Appellate Judge Herbert E. Phipps, concur.*