**FIRST DIVISION**
**BARNES, P. J.,**
**GOBEIL and PIPKIN, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules

*DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.*

June 29, 2020

# In the Court of Appeals of Georgia

A20A0397. WILLIAMS v. THE STATE.                              BA-015C

BARNES, Presiding Judge.

Following a jury trial, Tadarius Williams was convicted in Cobb County Superior Court of aggravated assault and aggravated battery. Williams now appeals from the denial of his motion for a new trial, claiming that the trial court abused its discretion in denying his request for a continuance to allow him to retain an expert witness. Williams further contends that the trial court erred in allowing the State to introduce evidence of his gang affiliation, including a note allegedly found under Williams's jailhouse mattress. Additionally, Williams asserts that the trial court violated his Sixth Amendment rights by limiting his cross-examination of two of the State's witnesses. He also challenges the trial court's denial of his motions for a mistrial, which were based on: (i) certain testimony of the State's expert witness; and

(ii) trial counsel's conflict of interest that prevented her from calling a potential witness. And Williams asserts an ineffective assistance claim, based on trial counsel's failure to retain an expert witness for trial. Finally, Williams claims that the trial court erred in denying his three motions to recuse the trial judge from hearing his motion for a new trial. Accordingly, in the event this Court grants him a new trial, Williams requests an order requiring the case be transferred to a different judge on remand.

For reasons explained more fully below, we find that the trial court erred in denying Williams's motion for a continuance and in limiting his cross-examination of the victim.[1] We further find, however, that Williams's arguments as to the recusal of the trial judge are unsupported by any citation to the record. Accordingly, we reverse the trial court's order denying Williams's motion for a new trial, but we deny Williams's request that we order the case transferred to a different judge on remand.

"On appeal from a criminal conviction, the defendant is no longer entitled to a presumption of innocence and we therefore construe the evidence in the light most favorable to the jury's guilty verdict." (Citation and punctuation omitted.) *Maddox*

---

[1] Our Georgia Supreme Court has held that in "considering whether a criminal defendant is entitled to a new trial [this Court] should consider collectively the prejudicial effect of trial court errors . . . where those errors by the court . . . involve evidentiary issues." *State v. Lane*, 308 Ga. 10, 14 (1) (838 SE2d 808) (2020).

2

*v. State*, 346 Ga. App. 674, 675 (816 SE2d 796) (2018). So viewed, the record shows that on December 25, 2013, the victim was shot as he left a neighbor's apartment following a Christmas gathering. The victim suffered gunshot wounds to his back and arm, and his injuries required hospitalization. After interviewing the victim, police identified Williams and two juveniles (D. M. and T. C.) as suspects. Police later showed the victim photographic lineups, from which he identified Williams, D. M., and T. C. as the men involved in the assault. Williams was arrested, and was subsequently indicted individually and as a party to the crime on a single count each of aggravated assault and aggravated battery.

Williams's trial was specially set for November 17, 2014. Ten days before trial, the State served supplemental discovery responses in which it identified for the first time Benjamin Miller and Investigator Charles Lyda as potential witnesses. The State also provided the defense with a copy of a search warrant allowing them to photograph Williams's tattoos, photos taken pursuant to the warrant, a disc containing a police interview of Miller, and a photocopy of a threatening note allegedly received by Miller on November 7. The same day it served the supplemental discovery, the State also filed a motion to admit evidence of Williams's status as a member of a street gang known as the Gangster Disciples. In support of this motion, the State

3

claimed that the indicted crimes constituted unindicted criminal gang activity, committed for the purpose of furthering "the reach of the gang." The State further contended that the evidence was admissible under OCGA § 24-4-404 (b) to show Williams's motive in committing the crimes at issue.

Just before trial, the court held a hearing on the State's motion to introduce evidence of Williams's gang affiliation. During that hearing, the State revealed for the first time that the prosecution would be calling Investigator Lyda as an expert in criminal gangs. Following the hearing, the trial court ruled that the evidence was admissible because under the State's theory of the case, Williams's gang membership was intrinsic to the crimes and relevant to prove motive. Defense counsel then requested a continuance to obtain an expert witness to refute the State's gang-related evidence, including Lyda's expert testimony. When the trial court asked what testimony she anticipated an expert witness would provide on behalf of the defense, trial counsel responded that although she had limited knowledge, she believed an expert could combat the testimony of Lyda on the subject of whether the crimes were gang-related and whether the note received by Miller indicated it was sent by a member of the Gangster Disciples. The trial court denied the motion for a continuance without explanation.

4

Also prior to trial, defense counsel informed the court that she represented one of the witnesses on the State's updated list (Mildred Alcinder) in a separate criminal matter. Counsel noted that if the State intended to call Alcinder, the case would need to be continued and a new attorney appointed, as she could not cross-examine her own client. The State indicated that it did not know definitively whether calling Alcinder would be necessary, and the trial court responded that, in the event Alcinder was called, it would have to declare a mistrial.

At trial, the victim testified that at the time of the incident, he resided in the Crescent Square Apartments in Cobb County. On the night in question, he went to a neighboring apartment, apartment B-12, where one of the juvenile co-conspirators, D. M., lived. While at the apartment, the victim and D. M.'s girlfriend got into a dispute, and the girlfriend told the victim she would have people "do stuff" to him. For the rest of the evening, the girlfriend wandered in and out of the apartment and acted as if she was keeping track of the victim's location. Shortly after the victim saw the girlfriend for the last time, Williams's second juvenile co-conspirator (T. C.) came to the door of the residence and told the victim that Williams and D. M. wanted to speak with him. Feeling uneasy, the victim left the apartment by the back door, but when he went around the building, he encountered Williams and D. M. Both men had

guns pointed at the victim, and Williams told D. M. to shoot. D. M. then shot the victim in the arm and back before he fled the scene with Williams. The victim later identified Williams and D. M. from a photo lineup as the men who assaulted him. Additionally, the victim identified Williams at trial as one of his assailants. On cross-examination, defense counsel attempted to question the victim about his gang affiliation, and the State objected on relevance grounds. The court sustained the objection, citing its previous ruling that the defense could not place the victim's character in issue.

The victim's mother testified that following the incident, an eyewitness who lived in apartment B-12 provided her with the names of the alleged assailants. Based on that information, the mother located pictures of D. M., D. M.'s girlfriend, and T. C. on social media and showed them to her son. After the mother stated the unidentified eyewitness lived in apartment B-12, defense counsel moved for a mistrial. In support of this motion, defense counsel noted that her client Alcinder lived in that same apartment, and given that Alcinder had assisted in the case against Williams, she believed she was ethically obligated to remove herself from both cases. The trial court denied the motion, noting that the victim's testimony showed that a

6

number of people lived in apartment B-12 and there was no evidence that Alcinder was the resident who approached the victim's mother and identified the suspects.

Benjamin Miller testified that he had been incarcerated with Williams at the Cobb County jail for the previous five months. Williams befriended Miller when the two were housed in the same pod at the jail. Williams told Miller that he was a member of the Gangster Disciples, and Miller noticed that Williams had a Gangster Disciples tattoo on his arm. According to Miller, Williams told him that Williams was charged with shooting a man who was "false claiming" membership in the Gangster Disciples. Miller further explained that false claiming referred to claiming membership in a gang to which you did not belong. After Williams confided in him, Miller had his attorney provide that information to the State in an effort to get out of jail.

Miller was aware that, based on the information he provided, the State had obtained a search warrant to photograph Williams's tattoos. The State executed the warrant on November 6, and the following day, Miller found a handwritten note on his bunk. The note, which was admitted into evidence, asked Miller why he was "snitching" and stated that the Gangster Disciples did not care about members of the United Nigerian Mafia, the gang to which Miller belonged. The note also threatened

Miller with death if he testified. Miller stated that Williams's was the only case in which he had agreed to testify.

On cross-examination, Miller agreed that he did not know who wrote the note or who placed the note on his bunk. Defense counsel attempted to question Miller about whether he had been involved in any fights in the jailhouse pod where he and Williams were housed. The State objected, and defense counsel pointed out that in his police interview, Miller had admitted to starting four fights in the pod. Counsel further explained that she believed one of the fights led Miller to provide false information to the State, as a means of retaliating against Williams. When the trial court asked defense counsel if she had any evidence that Miller was seeking retaliation against Williams for a fight, she responded that she did not. The trial court then sustained the State's objection.

During the afternoon of the first day of trial, the State informed the trial court and defense counsel that a deputy had just approached one of the prosecutors with a handwritten note confiscated on October 30, after it was found under Williams's mattress. When the State announced its intent to offer the note into evidence, defense counsel objected, arguing that the note had been in the State's possession since October 30 but had not been produced prior to trial. The court found no unfair

surprise, observing that Williams was also aware on October 30 of the writing's existence and its confiscation by the State. The court thereafter held a Jackson-Denno hearing on the note's admissibility and ruled that the State could introduce the note into evidence.

The deputy who found the note testified that he was currently assigned to work the pod at the jail where Williams was housed, and he also worked on gang intelligence. As part of his work in the housing pod, the deputy made nightly rounds and, if an inmate was out of his bunk, the deputy searched that bunk for contraband. Late on the evening of October 30, the deputy found Williams's bunk empty and "flipped the mattress." Underneath the mattress, he found a piece of paper containing a number of drawings that showed knowledge of the Gangster Disciples. Specifically, the note contained a number of symbols unique to that particular gang. The deputy took the note and when he did so, the inmate in the adjoining bunk made an unsuccessful attempt to grab it from him. When Williams later asked him about the note, the deputy told Williams he had taken it for "safekeeping."

After being qualified as an expert in criminal street gang investigations, Investigator Lyda testified that gang members identify themselves through colors and symbols associated with the gang. They incorporate those symbols and colors into

tattoos and display them on social media. Lyda explained that the Gangster Disciple's primary color is black and their secondary color is blue, and their primary symbols are a six-pointed star, a pitchfork, and a winged heart. Through Lyda, the State introduced, for demonstrative purposes, photographs Lyda had taken in previous investigations and which showed graffiti and tattoos featuring the symbols of the Gangster Disciples. . Lyda reviewed these pictures for the jury, pointed out the examples of the Gangster Disciple symbols, and explained the meaning behind some of those symbols. According to Lyda, both the note Miller found on his bed and the drawings found under Williams's mattress showed symbols associated with the Gangster Disciples. Additionally, Lyda testified that the drawings found under Williams's mattress included symbols showing disrespect to the Gangster Disciple's rival gangs.

Lyda also testified as to the photographs of Williams's tattoos and pictures taken from Williams's Facebook page. Lyda explained that the tattoos on Williams's shoulder and torso featured symbols of the Gangster Disciples. Williams's third tattoo featured the word "STAR," with the letter "A" written as an anarchy symbol.[2] Lyda stated that the anarchy symbol was increasingly popular among gangsters.

---

[2] The record shows that Williams's girlfriend was named Star.

10

With respect to the photos taken from Williams's Facebook page, Lyda testified that the black bandannas worn by Williams and his associates signified the "gang culture," as did the way the bandannas were folded around the neck. Additionally, some of the bandannas were folded across the faces of those in the photographs, in what Lyda called "a robbery mask." Lyda further explained that the people in the photos were making hand symbols that included a pitchfork and a "BK sign." "BK" stood for "Blood Killer," because the Bloods were a rival gang of the Gangster Disciples.

The State also introduced a photograph from a second Facebook account associated with Williams and which bore Williams's street name. In that photo, Williams was wearing black and was again making the BK hand sign. "FOLK like [Williams]" was written under the picture. When asked the significance of the term "FOLK" as it related to the Gangster Disciples, Lyda responded that FOLK is an acronym representing the network of gangs operating under or aligned with the Gangster Disciples. According to Lyda, the acronym stood for one of three things: Followers of Our Lord King Shorty; For Our Love of King Shorty; or Followers of Our Lord King Satan.

The prosecutor also asked Lyda the definition of a "black cherry," and he explained the term referred to a loose gang alliance, often between Gangster Disciples and Bloods. Lyda further stated that gangs form this type of alliance "because they're forming robbing crews [and] . . . different criminal schemes." Defense counsel objected to this testimony on relevance grounds, but the trial court overruled the objection.

Finally, Lyda confirmed that false claiming refers to an individual who falsely claims membership in a gang. He stated that false claiming is offensive to Gangster Disciples because the non-members have not gone through the initiation process, which "generally involves being beat down for a particular length of time by a certain number of gang members, or going out and doing a heinous crime to a rival gang member or doing a crime to somebody in the community." In Lyda's experience, the Gangster Disciples have a code that calls for addressing false claims "with violence, and oftentimes extreme violence." During his time as a law enforcement officer, Lyda had investigated murders and assaults that resulted from the victim false claiming gang membership.

Defense counsel moved for a mistrial three different times during Lyda's testimony. The first motion was based on Lyda's testimony that a gang initiation

process involved committing a "heinous crime"; the second was based on Lyda's statement indicating that Gangster Disciples were robbers; and the third motion was based on Lyda's testimony about Gangster Disciples being "Blood Killers." The trial court denied each of these motions.

The jury found Williams guilty of both counts of the indictment, and the trial court merged the charge of aggravated battery with the charge of aggravated assault and entered judgment on the jury's verdict. Williams then filed a motion for a new trial, which he amended twice.

At the hearing on the motion for a new trial, Williams's trial counsel testified that although Lyda was listed on the State's November 7 witness list, he was not identified as an expert witness. And given the State's other supplemental discovery responses, showing that Lyda had participated in the interview of Miller and the execution of the search warrant for photos of Williams's tattoos, counsel assumed that Lyda's testimony would be limited to those subjects. Instead, she learned the morning of trial that Lyda would testify as an expert on gang-related matters, and she therefore moved for a continuance so she could obtain an expert to testify on Williams's behalf. Additionally, during trial, counsel learned for the first time of the photos Lyda was using for demonstrative purposes to explain Gangster Disciple symbols. Trial counsel

13

further explained that even if the State had identified Lyda as an expert in its supplemental discovery, she still would have needed a continuance. The State identified Lyda late on the afternoon of Friday, November 7, with trial scheduled to start Monday the 17th. Because Williams was an indigent defendant, obtaining an expert witness for the case would require counsel to successfully move for funds for an expert and then locate an expert, feats which she could not accomplish in five business days.

With respect to her attempted cross-examination of Miller, trial counsel explained that prior to trial, she subpoenaed Miller's file from the jail, which showed he had been involved in a number of fights. She intended to cross-examine Miller about those fights to show that he had a motive to fabricate the things Williams allegedly confided to him.

Williams also presented the testimony of John Hagedorn, PhD, who was qualified as an expert in the behavior and organization of gangs, the public reaction to gangs, and gang stereotypes. Hagedorn testified that he reviewed the manual used in the training course on gangs taken by Lyda, and he considered it out of date, as it referred to gang coalitions that had not existed in at least 20 years. Additionally, Hagedorn contradicted some of the testimony offered by Lyda. With respect to false

14

claiming, Hagedorn stated that gangs are surrounded by people who have not been initiated into the group, and that "[g]angs often really enjoy that sort of thing. It's adulation. It's people throwing the [gang symbols] and pretending that they are one of them. So it's a common thing. And to say it's met by violence, this may be more inaccurate than even a stereotype." Hagedorn further testified that the statement that initiation into the Gangster Disciples involved submitting to a beating or committing a crime was inaccurate and reflected a stereotype. He stated that "Gangster Disciples, particularly, are blessed into the gang. They don't go through a beating[-]in process." Hagedorn also explained that with respect to gangs, the term "FOLK" referred to a coalition formed in the 70s and 80s that consisted of many gangs. According to Hagedorn, the word was not intended to function as an acronym, and to say that it could stand for "Followers of Our Lord King Satan" was "fairly ludicrous. The only place I've ever seen that is in law enforcement manuals." Hagedorn also explained that the fact that someone is making a hand sign for "Blood Killer" did not mean that the person had killed anyone. Instead, members of the Gangster Disciples would use that term to indicate what they were not – i.e., that they were not members of the Bloods. Additionally, Hagedorn took issue with Lyda's testimony regarding a gang's

15

use of bandannas, saying that the concept that a bandanna "denotes a robbery gang" or something similar was "farfetched."

When asked about the drawings found under Williams's mattress, Hagedorn testified that the paper showed the artist had knowledge about the Gangster Disciples and their symbols. In Hagedorn's opinion, however, the same could not be said for the author of the note found on Miller's bed. Specifically, Hagedorn testified that although the note featured a six-point star, the points of the star were numbered 1 through 6. Hagedorn then stated, "Nobody who is knowledgeable about the Gangster Disciples would number those points in that way. . . . [N]o member of the Gangster Disciples would make a drawing like that." Finally, Hagedorn testified that when Williams's case went to trial in November 2014, he would have been willing and able to provide the same testimony offered at the motion for new trial hearing.

At the end of the hearing, the trial court indicated that it would deny Williams's motion for a new trial, and asked the prosecutor to draft an order to that effect. Approximately two weeks after the hearing, Williams filed his first motion to recuse the trial judge, and he thereafter filed his third amended new trial motion. Williams filed a second motion to recuse the trial judge in May 2016 and a third such motion in January 2017. A different judge held an evidentiary hearing on Williams's first and

16

third recusal motions on January 25 and 26, 2017. At the request of the parties, however, the trial court did not consider the second recusal motion at that hearing because a necessary witness was unavailable. The parties thereafter submitted affidavit testimony relevant to the second motion and declined the opportunity to have a second evidentiary hearing.

The judge hearing the recusal motions entered an order in May 2017 denying Williams's first and third motions to recuse. Approximately one year later, in May 2018, that judge entered an order denying the second motion to recuse. In May 2019, the trial court entered an order denying Williams's original and amended motions for a new trial. Williams now appeals from that order.

1. Although Williams does not contest the legal sufficiency of the evidence of his guilt, we have reviewed the record and conclude that the evidence presented at trial authorized the jury to find Williams guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Wade v. State*, 305 Ga. App. 819, 821 (701 SE2d 214) (2010) ("[a]s long as there is some competent evidence, even though contradicted, to support each fact necessary to make out the State's case, the jury's verdict will be upheld) (citation and punctuation omitted). See also OCGA § 16-5-21 (a) (defining aggravated assault); OCGA § 16-5-24 (a) (defining aggravated battery).

2. Williams argues that the trial court erred in denying his motion for a continuance based on the State's failure to comply with the requirements of the Criminal Discovery Act (OCGA § 17-16-1, et seq.) In assessing this claim of error, we bear in mind that this Court will not reverse a trial court's grant or denial of a motion for continuance "except upon a clear abuse of the trial court's discretion." (Punctuation and footnote omitted.) *Easley v. State*, 352 Ga. App. 1, 5 (1) (833 SE2d 591) (2019). "[W]hile the abuse-of-discretion standard presupposes a range of possible conclusions that can be reached by a trial court with regard to a particular . . . issue, it does not permit a clear error of judgment or the application of the wrong legal standard." (Punctuation and footnote omitted.) *Williams v. State*, 328 Ga. App. 876, 880 (1) (763 SE2d 261) (2014). Put another way, "[a]n abuse of discretion occurs where a ruling is unsupported by any evidence of record or where that ruling misstates or misapplies the relevant law." (Citation and punctuation omitted.) *Jones v. State*, 345 Ga. App. 14, 14 (812 SE2d 337) (2018).

Georgia's Criminal Discovery Act provides, in relevant part, that

[t]he prosecuting attorney shall, no later than ten days prior to trial . . . permit the defendant . . . to inspect and copy or photograph a report of any physical or mental examinations . . . including a summary of the basis for the expert opinion rendered in the report, or copies thereof, if

18

the State intends to introduce in evidence in its case-in-chief or in rebuttal the results of the physical or mental examination . . . . If the report is oral or partially oral, the prosecuting attorney shall reduce all relevant and material oral portions of such report to writing and shall serve opposing counsel with such portions no later than ten days prior to trial.

OCGA § 17-16-4 (a) (4).

The purpose of the Criminal Discovery Act is "to promote fairness and efficiency in criminal proceedings," *State v. Brown*, 333 Ga. App. 643, 651 (2) (777 SE2d 27) (2015), and "to prevent surprise and trial by ambush." *White v. State*, 271 Ga. 130, 130 (1) (518 SE2d 113) (1999). See also *Jones v. State*, 276 Ga. 171, 174 (575 SE2d 456) (2003) ("[O]ur legal system is not simply an elaborate game of 'Gotcha!' . . . The object of all legal investigation is the truth, and procedural rules are in place to further such goal in an orderly fashion.") Thus, the Act functions to "maximize[] the presentation of reliable evidence, minimize[] the risk that a judgment will be predicated on incomplete or misleading evidence, and foster[] fairness and efficiency in criminal proceedings." (Citation and punctuation omitted.) *State v. Dickerson*, 273 Ga. 408, 410 (1) (542 SE2d 487) (2001). Where either party fails to comply with the statute's mandates, the trial court may fashion an appropriate

19

remedy, including granting a continuance, where the ends of justice may require. OCGA § 17-16-6. See also OCGA § 17-8-22; *Spencer v. State*, 296 Ga. App. 828, 830 (1) (676 SE2d 274) (2009) ("Generally a defendant has a duty to request a continuance to cure any prejudice which may have resulted from the State's failure to comply with the requirements of OCGA § 17-16-1 et seq.") (Punctuation and footnote omitted.)

In this case, the trial court found that its denial of Williams's motion for a continuance did not entitle him to a new trial for two reasons. First, the court found that when defense counsel requested a continuance, she did not raise the State's alleged discovery violation as a basis for that request. Accordingly, the court concluded that Williams had waived this claim of error. The trial court further found that even in the absence of waiver, Williams's claim had no merit because no discovery violation had occurred. Neither of these findings is supported by the record.

On the first day of trial, immediately after the trial court ruled that evidence of Williams's gang affiliation was admissible, defense counsel moved for a continuance to obtain a gang expert, citing the State's failure to provide the defense with information concerning its own expert on a timely basis. The State responded that it provided the information, including the fact that Lyda would be a witness, "ten days

20

prior to trial, as required by the [criminal discovery] statute." Defense counsel disputed the assertion that the State had complied with the statute, noting that she first learned of Lyda's status as an expert witness just minutes earlier. The trial court did not thereafter question defense counsel's assertion that the State's revelation of Lyda's expert witness status was untimely. Instead, the court asked defense counsel what testimony she anticipated a gang expert could provide on Williams's behalf. This exchange reflects that Williams's motion for a continuance was premised on the State's failure to comply with the Criminal Discovery Act and was understood as such by the trial court and the State. Accordingly, the trial court erred in concluding that Williams's waived this claim of error. Cf. *Spencer*, 296 Ga. App. at 831 (1) (a defendant waives an objection to a violation of the Criminal Discovery Act where he fails to request any of the relief available under OCGA § 17-16-6, including a continuance).

The trial court also erred when it found that the State had not violated OCGA § 17-16-4. As noted above, that statute requires the State to provide the defendant, no less than ten days before trial, a copy of any expert report based on a physical examination. OCGA § 17-16-4 (a) (4). Furthermore, where such report "is oral or partially oral, the prosecuting attorney shall reduce all relevant and material oral

21

portions of such report to writing and shall serve opposing counsel with such portions no later than 10 days prior to trial." Id. Here, the record shows that Lyda conducted a physical exam of Williams – i.e., he examined Williams's physical person for the purpose of photographing Williams's tattoos. And the expert opinions Lyda offered at trial were based, in part, on the results of his examination of Williams. Accordingly, the State was required to provide Williams, no later than ten days prior to trial, a written summary of any oral report Lyda provided to the prosecution.[3] Its failure to do so violated OCGA § 17-16-4 (a) (4). Given this fact, and given defense counsel's accurate description of the testimony she contemplated a gang expert would provide on behalf of her client, we find the trial court abused its discretion in denying Williams's motion for a continuance. See *Livingston v. State*, 266 Ga. 501, 503 (1) (467 SE2d 886) (1996) (given the State's failure to comply with the reciprocal provisions of the Criminal Discovery Act, the trial court abused its discretion in denying defendant's motion for a continuance). See also *Rhodes v. State*, 200 Ga.

_____

[3] The State did not assert, either at trial, in its response to Williams's new trial motion, or in its appellate brief, that Lyda did not provide the prosecution with an oral report. Instead, it asserted only that Lyda "wrote no report [for the State] to disclose." The record, however, shows that Lyda had provided the State with an oral report as to the results of his examination of Williams. Specifically, prior to trial, during its argument in support of its motion to introduce evidence of Williams's gang affiliation, the State outlined for the court Lyda's expected testimony.

22

App. 193, 194 (1) (407 SE2d 442) (1991) ("In the exercise of discretion, the trial judge has to consider the facts and circumstances of each case to determine what the ends of justice require . . . .") (citation and punctuation omitted).

To be entitled to a new trial based upon the denial of his motion for continuance, however, Williams bore the burden of showing that he suffered harm as a result of that denial. *Wainwright v. State*, 305 Ga. 63, 67 (2) (823 SE2d 749) (2019). To make this showing, Williams had to identify specifically the witness or witnesses and evidence "he would have put forth in his defense" if the trial court had granted his motion for a continuance. (Citation, punctuation, and emphasis omitted.) *Calhoun v. State*, 327 Ga. App. 683, 685 (1) (761 SE2d 91) (2014). See also *Easley*, 352 Ga. App. at 6 (1). We find that Williams met this burden. Specifically, Williams identified Dr. Hagedorn as the expert witness he would have called had he been afforded a continuance. And at the hearing on the motion for a new trial, Hagedorn offered testimony that rebutted Lyda's assertions that the Gangster Disciples were uniformly violent; that the Gangster Disciples had any kind of initiation process, violent or otherwise; and that the Gangster Disciples would always react violently towards any person falsely claiming membership in the gang. Additionally, Hagedorn refuted Lyda's testimony that the threatening note Miller allegedly found on his bunk was

23

written by member of the Gangster Disciples. In doing so, Hagedorn called into question the credibility of Miller – the witness around whom the State built its theory of the case. Because Williams met his burden of showing harm resulting from the denial of his motion for a continuance, we find that the trial court abused its discretion in denying Williams's motion for a new trial.

3. We now turn to those claims of error asserted by Williams that could recur during his new trial, beginning with Williams's assertion that the trial court erred in allowing the State to present evidence of his gang affiliation. Again, we review the trial court's decision on this issue for an abuse of discretion. *Williams*, 328 Ga. App. at 877 (1). And we find no abuse of discretion in the trial court's decision to admit certain of the evidence related to Williams's gang membership as intrinsic evidence of the charged crimes.

> Under longstanding Georgia law, all the acts and circumstances surrounding and constituting the res gestae are admissible, despite the fact that they may reflect poorly on the defendant's character. This rule carried forward to the [current] Evidence Code under the concept of "intrinsic facts" evidence, as compared to evidence of "extrinsic acts" which are generally inadmissible pursuant to OCGA § 24-4-404 (b).

*Baughns v. State*, 335 Ga. App. 600, 602 (1) (782 SE2d 494) (2016). And our Supreme Court has held that evidence regarding the defendant's gang affiliation is relevant and admissible when it is "'intrinsic' to the crimes charged." *Fleming v. State*, 306 Ga. 240, 245 (3) (a) (830 SE2d 129) (2019). Evidence is considered intrinsic to the crime at issue when it: (1) involves "an uncharged offense arising from the same transaction or series of transactions as the charged offense"; (2) is necessary "to complete the story of the crime"; or (3) is "inextricably intertwined with the evidence regarding the charged offense." (Citation and punctuation omitted.) *Williams v. State*, 302 Ga. 474, 485 (IV) (d) (807 SE2d 350) (2017). Under the foregoing factors, evidence is properly admitted if it "pertain[s] to the chain of events explaining the context, motive, and set-up of the crime," and also "is linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury." (Citation and punctuation omitted.) Id. at 485-486 (IV) (d).

Here, we find that certain evidence related to Williams's gang membership was intrinsic to the charged crimes of aggravated assault and aggravated battery. Specifically, under the State's theory of the case, evidence showing that Williams was a member of the Gangster Disciples and that the Gangster Disciples had a code

25

requiring that anyone falsely claiming membership in the gang be dealt with violently was admissible as evidence intrinsic to the charged crimes. Such evidence was "necessary to complete the story of the crime for the jury," as it put the crime in the context and served to explain why Williams participated in a seemingly unprovoked attack on the victim.[4] See *Bullard v. State*, 307 Ga. 482, 490 (3) (837 SE2d 348) (2019) (where the defendant was charged with malice murder, defendant's gang affiliation was intrinsic to the crime, as it served to prove the defendant's motive in engaging in the attack on the victim); *Fleming*, 306 Ga. at 245 (3) (a) (evidence of the defendant's gang affiliation was intrinsic to the charged crimes of murder and related offenses, where the record showed that the shooting was a retaliatory attack and the gang-related evidence provided context for the defendant's participation in the crimes).

Although "[e]vidence intrinsic to the charged offense is admissible and not subject to the limitations and prohibition on 'other acts' evidence found in OCGA §

---

[4] In reaching this conclusion, we note that the trial court allowed testimony related to Williams's alleged gang activity that was not relevant to any issue in the case, including Williams's motive. For example, Lyda's testimony regarding the fact that the Gangster Disciples entered alliances with other gangs to form "robbing crews and different criminal schemes" does not relate to any issue in the case. On retrial, therefore, the trial court should disallow such irrelevant testimony.

24-4-404 (b)," *Johnson v. State*, 348 Ga. App. 831, 833 (1) (823 SE2d 351) (2019), such evidence must nevertheless "satisfy the requirements of Rule 403." *United States v. Edouard*, 485 F3d 1324, 1344 (II) (C) (11th Cir. 2007). See also *Williams*, 302 Ga. at 485 (IV) (d). Rule 403 provides, in part, that "[r]elevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury[.]" OCGA § 24-4-403. Citing this law, Williams argues that even if evidence of his gang affiliation was otherwise admissible, such evidence should nevertheless have been excluded under Rule 403.

In reviewing the trial court's conclusion that Rule 403 did not require the exclusion of evidence concerning Williams's gang membership, we bear in mind that "in a criminal trial relevant evidence is inherently prejudicial; it is only when unfair prejudice substantially outweighs probative value that [Rule 403] permits exclusion." (Emphasis omitted.) *United States v. King*, 713 F2d 627, 631 (III) (11th Cir. 1983). The primary "function of Rule 403 is to exclude matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." (Citation and punctuation omitted.) *Hood v. State*, 299 Ga. 95, 103 (4) (786 SE2d 648) (2016). Thus, "the exclusion of evidence under Rule 403 is an extraordinary

27

remedy [that] should be used only sparingly." (Citation, punctuation, and footnote omitted.) *Olds v. State*, 299 Ga. 65, 70 (2) (786 SE2d 633) (2016).

Here, given the intrinsic nature of the evidence, we find that the trial court did not abuse its discretion in finding that the probative value of the evidence related to Williams's gang affiliation was not substantially outweighed by the danger of unfair prejudice. We note that "there was nothing inherent in this evidence that would create a risk that [Williams] would be convicted on a ground different from proof specific to the offense[s] charged." (Citation and punctuation omitted.) *Flowers v. State*, 307 Ga. 618, 623 (2) (837 SE2d 824) (2020). Moreover, there was nothing in the relevant evidence used to prove Williams's gang membership that "would shock the average juror or otherwise render the jury incapable of weighing the evidence in a disinterested manner." (Citation and punctuation omitted.) Id. Accordingly, "we cannot say that any prejudice [this evidence] might have caused outweighed its significant probative value." (Citation and punctuation omitted.) Id. See also *Fleming*, 306 Ga. at 245 (3) (a) (where evidence of defendant's gang affiliation was intrinsic to the charged crime, its probative value was not substantially outweighed by the danger of unfair prejudice).

28

4. Williams claims that the trial court violated his constitutional right to confront the witnesses against him by erroneously limiting his cross examinations of the victim and Miller. Both the United States and the Georgia constitutions guarantee the accused the right to confront the witnesses against him. *Lucas v. State*, 303 Ga. 134, 137 (2) (810 SE2d 491) (2018). And "'[t]he main and essential purpose'" of this right "'is to secure for the opponent the opportunity of cross-examination.'" *State v. Vogleson*, 275 Ga. 637, 638 (1) (571 SE2d 752) (2002), quoting *Davis v. Alaska*, 415 U.S. 308, 315-316 (94 SCt 1105, 39 LEd2d 347) (1974). See also *Hibbs v. State*, 299 Ga. App. 723, 727 (2) (683 SE2d 329) (2009) ("The right to confrontation is a trial right, designed to prevent improper restrictions on the type of questions that defense counsel may ask during cross-examination.") (punctuation and footnote omitted.) "Like most questions about the admissibility of evidence, the scope of cross-examination is committed in the first instance to the sound discretion of the trial court and we review a limitation of cross-examination only for an abuse of that discretion." *Lucas*, 303 Ga. at 136-137 (2). That discretion is limited, however, not only by a defendant's constitutional right to cross-examination, but also by Georgia's Rules of Evidence. Those Rules provide, in relevant part, that "[a] witness may be cross-examined on any matter relevant to any issue in the proceeding. The right of a

29

thorough and sifting cross-examination shall belong to every party as to the witnesses called against the party." OCGA § 24-6-611. Bearing these principles in mind, we turn to Williams's claims of error.

(a) The trial court found that Williams was not entitled to cross-examine the victim with respect to his gang membership (or lack thereof) or whether his facial tattoo reflected such membership. Specifically, the court ruled that this line of questioning would impermissibly place the victim's character in issue. This reasoning, however, ignores the relevance of the victim's gang affiliation (or lack thereof) to the State's theory of the case, and therefore to Williams's defense.

Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." OCGA § 24-4-401. Here, the State contended that Williams assaulted the victim because the victim was falsely claiming membership in the Gangster Disciples. Thus, to the extent gang affiliation placed the victim's character in issue, it was a result of the State's theory of the case. Accordingly, given the State's theory, and in light of Miller's testimony supporting that theory, Williams was entitled to question the victim as to whether he had, in fact, falsely claimed membership in the Gangster Disciples or whether he

30

actually was a member of the Gangster Disciples. By cutting off this line of inquiry, the trial court prevented Williams from "expos[ing] to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of [Miller]." (Citations and punctuation omitted.) *Vogleson*, 275 Ga. at 642 (3). See also *Hibbs*, 299 Ga. App. at 727 (3). The trial court, therefore, abused its discretion in limiting Williams's cross-examination of the victim in this fashion. Id. at 640 (1) ("[i]t is clear that the trial court abuses its discretion and commits error when it cuts off all inquiry on a subject on which the defense is entitled to reasonable cross-examination").

(b) Williams contends that the trial court erred in limiting his cross-examination of Miller with respect to whether Miller had started fights in the jail pod housing Williams and Miller. At trial, however, when asked by defense counsel if he had started fights, Miller denied doing so. And although defense counsel argued that additional questions on this issue were necessary to prove Miller's bias and motive for testifying against Williams, she also admitted she had no independent evidence to show that Miller had been involved in fights. Under these circumstances, we cannot say that the trial court erred in sustaining the State's objection to defense

counsel's continued questioning of Miller on this subject.[5] See *Jackson v. State*, 237 Ga. 663, 663 (229 SE2d 345) (1976) (trial court did not err in limiting defendant's continued cross-examination of witness "for the purpose of showing bias" where the witness's previous responses "failed to show any bias"). See also *Moore v. State*, 251 Ga. 499, 501-502 (2) (a) (307 SE2d 476) (1983) (trial court properly limited defendant's cross-examination of a witness where the questions became "argumentative and were merely cumulative of the prior questions").

5. Williams argues that the lower court erred in denying his motions to recuse the judge who presided over his original trial and therefore requests that we order his case to be transferred to a different judge on remand. In his brief, however, Williams offers no citations to the record to support his argument that one or more of his motions to recuse should have been granted. Georgia Court of Appeals Rule 25 (c) (2) (i) provides that "[e]ach enumerated error *shall* be supported in the brief by

---

[5] We note, however, that at the hearing on his new trial motion, Williams presented the testimony of a third inmate housed in the same pod as Miller and Williams. The inmate testified that he saw Williams and Miller engage in a physical fight. Additionally, the inmate stated that, based on his interaction with both men, he believed Miller had a grudge against Williams and he did not believe Williams would ever confide anything to Miller. Assuming that Williams offered similar testimony at his new trial, defense counsel could cross-examine Miller as to whether he had been involved in any fights with Williams.

specific reference to the record or transcript." (Emphasis supplied.) And Williams cannot satisfy Rule 25 (c) (2) (i) by incorporating by reference in his appellate brief the briefs filed in the court below in support of his motions to recuse. See *R & G Investments v. American Family Ins. Co.*, 337 Ga. App. 588, 591 (1) (787 SE2d 765) (2016). Thus, as we have explained on numerous occasions, "absent such specific references [to the record], this Court will not search for and may not consider that enumeration. . . . [I]t is not the function of this Court to cull the record on behalf of a party in search of instances of error. Instead, the burden is upon the party alleging error to show it affirmatively in the record." (Punctuation and footnotes omitted.) *Cawthon v. State*, 350 Ga. App. 741, 743, (830 SE2d 270) (2019). See also *Mantooth v. State*, 303 Ga. App. 330, 336, n. 22 (693 SE2d 587) (2010) ("We caution counsel that this Court's rules are designed to facilitate the consideration of enumerated errors and compliance with such rules is not optional.") Accordingly, we find that Williams has abandoned this claim of error and the accompanying request for relief. See *Greene v. State*, 295 Ga. App. 803, 809 (6) (673 SE2d 292) (2009); *Glass v. State*, 255 Ga. App. 390, 398 (9) (b) (565 SE2d 500) (2002).

6. In light of our holding in Division 1, we need not address Williams's remaining claims of error.

For the reasons set forth above, we reverse the trial court's denial of Williams's motion for a new trial.

*Judgment reversed. Gobeil, J. concurs. Pipkin, J., concurs in division 1, 3, 4, 5, 6 and in judgment only in division 2.\**

**\*DIVISION 2 OF THIS OPINION IS PHYSICAL PRECEDENT ONLY. SEE COURT OF APPEALS RULE 33.2 (a).**